IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JEFFREY PAUL HOWE,                    )
                                      )
                                      )
            Plaintiff,                )
                                      )
v.                                    )          CASE NO.: 1:15cv113-JA-SRW
                                      )
CITY OF ENTERPRISE, et al.            )

**REPORT AND RECOMMENDATION[1]**

I.     **Introduction**

        Plaintiff Jeffrey Paul Howe ("plaintiff") brings this action for money damages

pursuant to 42 U.S.C. §§ 1983 and 1988. *See* doc. 51. Named as defendants in the 43-page

complaint are the City of Enterprise ("the City"), Berney Partridge ("Partridge"), Tomas

Arias ("Arias"), Jason Anderson ("Anderson"), Chris Hurley ("Hurley"), Richard Hauser

("Hauser"), and Thomas D. Jones ("Jones"). *See id*. Defendant's second amended

complaint is comprised of nine claims. The first five are federal claims: illegal seizure in

violation of the Fourth Amendment against defendants Partridge and Arias (count one);

excessive force in violation of the Fourth Amendment against Partridge and Arias (count

two); violation of the Second Amendment against Partridge and Arias (count three);

malicious prosecution in violation of the Fourth Amendment against Partridge and Arias

and "supervisory defendants" (count four); and "*Monell* liability" against the City, Jones,

---

[1] The motion addressed in this recommendation (Doc. 55) was referred to the undersigned for
consideration. *See* Doc. 63.

1

and "supervisory defendants" (count five). The remaining claims arise out of Alabama state law: malicious prosecution against Partridge and Arias (count six); assault and battery/excessive force against Arias and Partridge (count seven); trespass against Arias, Partridge, and the City (count eight); and negligence against Arias, Partridge and the City (count nine). Defendants' motion to dismiss the second amended complaint is the subject of this recommendation.

Before discussing the merits of the motion, the court must address the extraordinary obstacles which the parties have placed in the path of its resolution. The parties' collective disregard for providing the court with a clear, well-organized record, has rendered it an arduous task to address this motion. First, defendants compelled the court to review 557 pages of extrinsic materials and address whether – pursuant to two distinct theories – excerpts from those materials could be considered in ruling on the motion, despite the fact that most of their requests rested on tenuous legal grounds. Plaintiff then complicated matters further by filing a brief in opposition to defendants' motion to dismiss that addressed only one issue – whether the court could consider the extrinsic evidence defendants cited. *See* doc. 59. In other words, to be clear, plaintiff's opposition brief did not address a single substantive argument made in defendants' 40-page motion to dismiss. *See id*. Defendants then filed a reply brief which argued that by failing to address any of the substantive arguments in the motion to dismiss, plaintiff had abandoned all nine of his claims. *See* doc. 62.[2]

---

[2] The instant motion to dismiss was referred to the undersigned a few weeks after the reply brief was taken under submission. *See* doc. 63.

Nearly two months after the reply was filed, plaintiff filed a motion for leave to file a five-page sur-reply, *see* doc. 64. Without deciding whether it would consider the contents of the sur-reply in reviewing the motion to dismiss, the court granted plaintiff leave to file it. *See* doc. 67. The sur-reply, *see* doc. 68, incorporated by reference portions of plaintiff's response to the defendants' motion to dismiss the *first* amended complaint, *see* doc. 30 – despite the fact that defendants' motion to dismiss the first amended complaint, *see* docs. 23-24, and plaintiff's response to it, *see* doc. 30, had been rendered moot by the filing of the instant, second amended complaint, *see* doc. 51. This notwithstanding, plaintiff argued that his claims in the first amended complaint were essentially identical to his claims in the second amended complaint *and* that defendants' arguments in their motion to dismiss the first amended complaint were essentially identical to the arguments raised in their motion to dismiss the second amended complaint. *See* doc. 68. Thus, plaintiff maintained, his response to defendants' motion to dismiss the first amended complaint addressed the substantive arguments raised in the motion to dismiss the second amended complaint. In other words, by incorporating his earlier arguments by reference in his sur-reply, plaintiff sought to cure his failure to address defendants' arguments properly in his opposition to the instant motion.[3]

---

[3] The court will not permit plaintiff to engage in such a practice in the future. First, this "amount[s] to outsourcing the party's responsibility to research and construct its own argument within its memorandum." *South Carolina v. United States*, 232 F. Supp.3d 785, \*796 (D.S.C. Feb. 7, 2017). Second, parties who do so "essentially as[k] th[e] [c]ourt to read everything it has filed and, after doing so, construct a coherent argument against the [d]efendants' [m]otion – a task which plaintiff was obligated to do within his [or her] opposition brief." *Id.* (citing *Propst v. HWS Co., Inc.*, 148 F. Supp. 3d 506, 511 (W.D.N.C. 2015). *See also Daniel v. Nat'l Cas. Ins. Co.*, 2014 WL4955402, \*2 (D. Md. Sept. 29, 2014)(decrying parties' attempt to "have the court review the entirety of their

After plaintiff filed the sur-reply, the defendants filed a motion for the court to reconsider its order, *see* doc. 69; the court denied the motion, but granted defendants leave to file a response to the sur-reply. *See* doc. 70. Defendants, upset that plaintiff had incorporated into the sur-reply what it referred to as 46 pages of his response in opposition to defendants' earlier motion to dismiss, requested leave to file a 50-page response to the sur-reply, which the court granted. Finally, the motion was taken under submission, and the court began the laborious task of attempting to resolve it based on the lengthy and complicated pleadings and record before it.[4]

As explained below, the court concludes that defendants' motion is due to be granted in part and denied in part.

## II.   Federal Rule of Civil Procedure 12(b)(6) Standard of Review

In order to survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. Pro. 12(b)(6), the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp., v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007). The standard for a motion to dismiss under Rule 12(b)(6) was explained in *Twombly* and refined in *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct.1937, 1949 (2009), as follows:

---

respective prior filings and guess which portions thereof they may contend, *mutatis mutanda*, are pertinent").

[4]  The pleadings, briefs, exhibits, incorporated briefs, and prior pleadings and motions necessary to review on this motion to dismiss totaled 473 pages of pleadings and briefs and 557 pages of extrinsic evidence. In the future, the parties will be expected to streamline, condense, organize, and support their submissions properly within strict page limitations.

Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

*Iqbal,* 556 U.S. at 678-679 (citations and internal edits omitted).

The *Twombly-Iqbal* two-step analysis begins "by identifying the allegations in the complaint that are not entitled to the assumption of truth" because they are conclusory. *Id.,* at 195; *Mamani v. Berzain,* 654 F. 3d 1148, 1153 (11th Cir. 2011) ("Following the Supreme Court's approach in *Iqbal,* we begin by identifying conclusory allegations in the Complaint."). After conclusory statements are set aside, the *Twombly-Iqbal* analysis requires the Court to assume the veracity of well-pleaded factual allegations, and then to determine whether they "possess enough heft to set forth 'a plausible entitlement to relief.'" *Mack v. City of High Springs,* 486 F. App'x 3, 6 (11th Cir. 2012) (quotation omitted.) "To survive a motion to dismiss, a complaint need not contain 'detailed factual allegations' but instead the complaint must contain 'only enough facts to state a claim to relief that is plausible on its face.'" *Maddox v. Auburn Univ. Fed. Credit Union,* 441 B.R. 149, 151 (M.D. Ala. 2010) (Citation omitted). Establishing facial plausibility, however, requires more than stating facts that establish mere possibility. *Mamani,* 654 F. 3d at 1156 ("The

possibility that – *if* even a possibility has been alleged effectively – these defendants acted unlawfully is not enough for a plausible claim.") (emphasis in original). Plaintiff is required to "allege more by way of factual content to nudge [her] claim … across the line from conceivable to plausible." *Iqbal,* 129 S. Ct. at 1952 (internal editing and citation omitted.)

### III.  __Factual Background__[5]

Plaintiff's claims stem from events occurring at his home on February 16, 2013, and his resulting arrest and prosecution. In his second amended complaint, plaintiff alleges that during the early morning of hours of February 16, 2013, he had an argument with his wife, Vickie Howe ("Howe"), at their home in Dogwood Acres, a mobile home community near Enterprise, Alabama. During the argument, at about 3:00 a.m., Howe left the home to spend the night at the home of her son, Michael Thorpe ("Thorpe").

Shortly after she left, Howe called Thorpe from her car and informed him that she had been drinking, she and plaintiff had argued, she had left her house, and she was driving to his home to sleep. However, the call ended abruptly when her cellular service was disrupted. Between 3:30 and 3:45 a.m., Thorpe made an emergency 911 call. Vernal Beal, a dispatch communications employee for the Enterprise Police Department answered the call. Thorpe told Beal that Howe had been involved in a domestic disturbance with plaintiff at their home, and that Howe had left the home in her gold Buick Regal. Plaintiff alleges that though he "had not been violent or threatening toward … Howe or anyone else,"

---

[5] These facts are gleaned exclusively from the allegations of the second amended complaint. They are the operative facts for the purpose of ruling on the motion to dismiss, except to the extent they are supplemented by documents of which the court takes judicial notice for the limited and explicit purposes stated in this Recommendation. *See* section IV, *infra*.

Thorpe then made a second 911 call during which he stated that plaintiff "kept some weapons in his house." *See* doc. 51 at 6-7.

After the second 911 call, Beal issued a dispatch on the Enterprise Police Department radio, describing a "routine domestic disturbance" at plaintiff's address. *See id.* at 7. Defendants Arias and Partridge, both police officers for the City, responded to the call. Before Arias and Partridge arrived at plaintiff's home, Beal told them that "this was a routine domestic disturbance" and that "the caller reported that … there were weapons in the house." *See id*. Beal was silent as to whether weapons were involved in the domestic disturbance and did not state explicitly, or otherwise indicate, that "that the call [to which they were responding] involved violence, threats, guns or other dangerous activity." *See id.* Beal did not report any "alleged victims" or "suspected criminal activity" and did not mention "hostile behavior." *See id.*[6]

---

[6] The second amended complaint alleges as follows:

> 25.    Thorpe called 911 a second time and even though Plaintiff had not been violent or threatening towards Vickie Howe or anyone else, he advised that Plaintiff kept some weapons in his house.

> 26.    Following Thorpe's second 911 call, Beal issued a police dispatch communication on the Enterprise police radio advising of the domestic call at the Plaintiff's Dogwood Acres address.

> 27.    Beal's dispatch communication described the Dogwood Acres call at Plaintiff's address as a routine domestic disturbance at Plaintiff's address, and gave no indication whatsoever that the call involved violence, threats, guns or other dangerous activity.

> 28.    Before Arias and Partridge arrived at Plaintiff's house[,] Beal communicated to Partridge and Arias that this was a routine domestic disturbance *and that the caller reported that while the caller stated* there were weapons in the

Partridge, Arias, and an unidentified third City police officer arrived in plaintiff's neighborhood at approximately 3:50 a.m. The complaint alleges that the City and/or Chief Jones, whom plaintiff alleges to be "final policymakers with respect to all law enforcement decisions made within the Enterprise Police Department," at some point adopted a policy or custom for Enterprise Police Department officers to follow when responding to routine domestic calls. According to plaintiff, during domestic calls – even those domestic calls made late at night – officers are required to avoid detection as police officers when approaching a home or apartment and to draw their guns, but not announce their identity when knocking on the door of a targeted home. Thus, while each of the three officers reported to the scene in his respective police cruiser, none of the officers used his cruiser's blue emergency lights or sirens in order to conceal their identities as officers. Further, to avoid detection by plaintiff, the officers parked in a "dark location" in front of a neighbor's house "several doors down from plaintiff's home." *See id*. at 8-9. Arias parked his car on

---

house, there was no indication that the weapons were involved in the domestic disturbance.

29.     The domestic disturbance call hat Arias and Partridge responded to Plaintiff's house did not involve or report any alleged victims, suspected criminal activity, use of weapons or mention of hostile behavior.

doc. 51 at 6-7 (emphasis supplied). The court has reviewed these paragraphs carefully, and has paid particular attention to the italicized section, which is either set out inartfully or contains typographical errors. At first glance, it appears plaintiff states that Beal told Partridge and Arias that this was a routine domestic disturbance *and* that she also told them that the caller had told her that there were weapons in the house *and* that she explicitly told them that the caller did not indicate that the weapons were actually involved in the domestic disturbance. However, taking these five paragraphs together, the court's plain reading of paragraph 28 is that Beal told Partridge and Arias through the dispatch radio that there was a domestic disturbance *and* that the caller had stated there were weapons in the house, but that Beal was silent as to whether weapons were involved in the subject domestic disturbance.

the road and Partridge parked immediately behind Arias. The third officer parked down the street facing the opposite direction.

There was "sparse lighting in the Dogwood Acres community." At approximately 3:52 a.m., Arias and Partridge began walking down the dark road from their parked cars to the front entrance of plaintiff's home, with Arias falling behind Partridge. *See id*. The front door of Plaintiff's mobile home is located in the middle of the home. In order to reach the door, one must climb ten stairs leading to a wooden porch, which measures approximately eight feet by ten feet, then walk an additional eight feet across the deck to the door.

Arias and Partridge ascended the steps to plaintiff's front porch, which was lit by a single 40-watt bulb located two feet to the left of the doorway. While they mounted the stairs, both officers reached with their right hands and removed their handguns from their holsters. Once Partridge reached the top, he faced the front door. The door handle was on the left side of the door and the hinge was to the right. Partridge moved to the right side of the doorway and away from the light on the left and assumed a tactical position against the exterior wall of home, a few feet to the right of the doorframe. He had his gun in his right hand, pointed toward the door. Arias, who had stopped midway up the stairs, also took a crouching, tactical position and pointed his gun at the front door. Arias was in the dark and out of plain sight, approximately ten feet from the door.

Back on the deck, Partridge knocked loudly on plaintiff's front door seven times. Neither Partridge nor Arias announced their identities as law enforcement. Plaintiff was alarmed by the knocking and, "in an effort to protect himself and his home," carried a

handgun as he went towards the door.[7] According to plaintiff, in the weeks and month leading up the night in question, there had been reports of burglaries and break-ins at other homes in the Dogwood Acres community. Seven seconds elapsed before plaintiff used his left hand to open the door slowly. Neither officer said anything prior to his opening the door. As he was opening the door, plaintiff was holding the handgun in his right hand against his right hip and thigh and pointing it towards the floor. The door opened in an inward direction, so he had to step back and away from the door's threshold as he opened it. Plaintiff pulled the door open to approximately 90 degrees from its closed position and moved toward the right of the door to see who was outside.

As plaintiff looked outside from his position approximately two or three feet away from the threshold, his left hand remained on the door handle and his right hand held the gun, which was at hip level and still pointed towards the floor. The first thing plaintiff saw was "a gun pointed at him by an anonymous person crouched in the dark on the stairway more than ten feet from the front door." *See id*. at 13. He glanced to his left and saw Partridge, who was five to six feet from where plaintiff was standing inside the home, pointing a gun at him.

Plaintiff did not know who the men were and did not recognize the officers' dark clothing as police uniforms. "The instant [p]laintiff saw" the officers, he turned his body away from the doorway "in an act of self-preservation." *See id*. at 12-13. Plaintiff alleges

---

[7]  According to plaintiff, Arias and Partridge knew that many individuals in the county own guns and that gun-owners are likely to bring a gun to the door at such an hour. Therefore, plaintiff alleges, Arias and Partridge knew it was foreseeable that plaintiff, whom they knew to be a gun-owner, would come to the door with a gun.

that he "turned slightly to the left and then twisted his body to his right and away from the doorway." *See id.* at 15. Arias and Partridge fired nine rounds from their handguns, striking plaintiff twice in the back. According to plaintiff, Partridge "blindly fired several rounds from his gun through the exterior wall of the mobile home" and through the open door. *See id.* at 13. Plaintiff alleges that less than a second and a half expired from the time plaintiff stepped out from behind the door after he opened it until the time the officers began firing their weapons. Plaintiff alleges that he never crossed the threshold onto the deck or stepped towards the officers. Plaintiff further claims that he never raised, aimed, or pointed his weapon at the officers. There were no independent witnesses to the shooting.

After he was shot, plaintiff fell forward onto the floor in his home and placed his gun on the coffee table. Officers Arias and Partridge came into the home. Arias handcuffed plaintiff's hands behind his back. Emergency medical personnel then arrived on the scene and transported plaintiff to Medical Center Enterprise and then Flowers Hospital, where he had emergency surgery to treat his gunshot wounds.

Plaintiff alleges that Arias and Partridge were trained to know that a shooting investigation would immediately follow this officer-involved shooting and that it would be conducted by their supervising officers, as well as members of the Alabama Bureau of Investigation. Plaintiff further alleges that Arias and Partridge were trained on the requirements of the law as to an officer's use of deadly force and the fact that an officer can be held liable for excessive force, that using deadly force on an individual in his home can subject an officer to liability unless it is reasonable for the officers to believe the

individual poses an immediate threat to the safety of the officers or others, and that shooting an individual for exercising his right to hold a weapon in his home is not legally justified.

Plaintiff also alleges that at the time of the shooting and thereafter, Arias and Partridge knew that, given their vehicles' parked position down the street, the cameras in their vehicles could not video-record what occurred on plaintiff's front porch. Plaintiff alleges that Arias and Partridge were trained to understand that in order "to escape criminal and/or civil liability for shooting [p]laintiff, their account of what precipitated the shooting must allege that plaintiff posed an immediate threat to their safety when he answered the door." *See id*. at 18.

Plaintiff further alleges that Arias and Partridge knew at the time of the shooting that Partridge's car camera was recording the audio of their verbal interaction with plaintiff immediately after the shooting. Plaintiff claims that Arias and Partridge also knew that this audio recording would be reviewed during the post-shooting investigation and would be considered evidence at any potential criminal or civil proceeding against them. According to plaintiff, "almost immediately after the shooting,"[8] Partridge "proceeded to verbalize a false and self-serving account of what occurred by falsely stating that plaintiff threatened Partridge by pointing a gun at Partridge's head immediately after plaintiff opened the door." Plaintiff alleges that, within minutes after the shooting, Arias overheard Partridge's account and then supported Partridge's false account in order to protect himself and

---

[8] Though it is not entirely clear, plaintiff's use of the phrase "after the shooting" in this paragraph appears to refer to events which occurred after the shooting, but while the officers were still on the scene.

Partridge. According to plaintiff, the officers made these false statements in an effort to escape criminal and/or civil liability for shooting plaintiff.

Plaintiff maintains that during the post-shooting investigation, Arias and Partridge gave false reports to fellow officers, their supervisors, and police investigators. Plaintiff claims that the officers said that during the one and a half seconds between the time plaintiff opened the door and the time they began to shoot, plaintiff did the following: he slung the door open quickly, he stepped from behind the door with a gun, he raised his gun at Partridge's head, he took aggressive steps to within one of two feet of Partridge, he refused to put his gun down despite being ordered several times to do so before the officers opened fire, and he stopped advancing and twisted his body around to retreat into the home.[9]

Plaintiff also alleges that Partridge and Arias agreed to "cover up the fact that plaintiff did not threaten" them and prepared "false written statements or false written reports" concerning the shooting. According to plaintiff, Partridge and Arias failed to provide prosecutors with exculpatory evidence that would have shown that plaintiff had not threatened the officers.

Plaintiff was discharged from Flowers Hospital a few days after the shooting and immediately arrested on two separate charges of menacing, as defined by Ala. Code §13A-6-23, for allegedly threatening the officers with serious harm with a gun. Plaintiff alleges

---

[9] The court cannot tell from the complaint when Arias and Partridge allegedly made these statements. While plaintiff says they were made during the "post-shooting investigation," it is unclear whether they were made on the scene or in some interview or other conversation that followed. The court likewise cannot determine who was conducting the investigation or to whom Arias and Partridge made these statements.

that these charges were the result of Arias' and Partridge's supplying false information to their supervisors and to state investigators and prosecutors. After his arrest, defendant was transported to the Dale County Jail, where he remained until he bonded out on February 21, 2013 – five days after the shooting. Plaintiff alleges that he was caused to retain and pay for attorneys to defend him against the charges, which were filed in the Circuit Court for Dale County, Alabama.[10] Plaintiff was tried by a jury and was acquitted of all charges.

## IV.    The facts set out in defendants' motion to dismiss

Before the court proceeds further, it must address defendants' proffer of "the pertinent facts" in their motion to dismiss. *See* doc. 55 at 2. Most of these facts are gleaned from a multitude of extrinsic documents, none of which is actually attached to complaint or, for that matter, to the motion to dismiss. The exhibits are as follows: (1) the 165-page transcript from plaintiff's underlying criminal trial ("the transcript") (doc. 11-1)[11]; (2) one of the defendant officers' car camera video recordings ("the video")(doc. 19, B)[12]; (3) 46 pages of filings from plaintiff's criminal case bearing the case number CC-15-94 (doc. 24-3); (4) 61 pages of filings from plaintiff's criminal case bearing the case number CC-2015-95 (doc. 24-4); 6 pages of filings bearing the case numbers CC-15-94 and CC-15-95 (doc. 24-5); 141 pages of filings bearing the case number CC-13-358 (doc. 24-2); and 138 pages

---

[10]  According to plaintiff, the case numbers are as follows: CC-2013-00357 and CC-2013-00358.

[11]  This is an exhibit to defendant's motion to dismiss the first complaint, which is now moot. It was not attached as an exhibit to the second amended complaint or the instant motion to dismiss.

[12]  This was an exhibit to plaintiff's first amended complaint, which is now moot. It was not attached as an exhibit to the second amended complaint or the motion to dismiss it.

of filings bearing the case number CC-13-357 (doc. 24-1).[13] Defendants argue in a footnote to a heading in their motion that "[a]ll of the exhibits cited in [their] [m]otion, including the trial transcript and Officer Partridge's car camera video, are part of the record of [p]laintiff's underlying state court criminal proceedings, and therefore, may be considered on a motion to dismiss." *See id*. Though not expressly stated in this way, defendants' position is that because the exhibits they rely on were made part of the record of plaintiff's underlying state court criminal proceedings, the court may take judicial notice of these documents and the facts set out therein.

Additionally, in their reply brief (doc. 62 at 1-2), defendants appear to argue that there is a second line of cases, distinct from the jurisprudence of judicial notice, that permits the court to consider the transcript (doc. 11-1), the video (doc. 19, Ex. B), and the "state court records" on a motion to dismiss. Defendant refers the court to an exception to the rule that ordinarily bars consideration of evidence outside the four corners of the complaints. Though defendant does not describe it as such, some courts refer to this exception as the "incorporation by reference exception."

Before the court addresses the admissibility of defendants' exhibits under either theory, a brief discussion of the relied-upon doctrines is necessary.

**(a)   Judicial notice**

---

[13]  This, along with Docs. 24-2 through 24-5, was an exhibit to defendants' motion to dismiss, which is now moot. These documents were neither attached to the second amended complaint nor to the subject motion to dismiss.

Federal Rule of Evidence 201 allows a court to take judicial notice of "adjudicative facts" that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201 ((a)-(b)). "Under Rule 201 of the Federal Rules of Evidence, a court '*may* take judicial notice on its own' or '*must* take judicial notice if a party requests it and the court is supplied with the necessary information.'" *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014) (citation omitted; emphasis in original). A court may take judicial notice "at any stage in the proceeding." *See id.* at 1273 (citation omitted). "Nevertheless, the taking of judicial notice of facts is 'a highly limited process ... [because] the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court.'" *Martincek v. LVNV Funding, LLC*, 2017 WL 2903356, *2 (11th Cir. Mar. 16, 2017)(quoting *Lodge* at 1273). *Accord, United States v. Falcon*, 957 F. Supp. 1572, 1585 (S.D. Fla. 1997) ("A court's decision to take judicial notice of a fact is nothing more than a finding that the proffering party need not undertake the burden of litigating the existence of the fact.").

Moreover, while judicial notice is "a highly limited process" that can be undertaken at "any stage of the proceeding," it "may be taken only to establish what those documents contain, *not* the veracity of their contents." *Baker v. Batsmasian*, 2017 WL 696123, *1 (S.D. Fla. 2017)(internal citations omitted)(emphasis added). In *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994), the Eleventh Circuit explained the reasons that a court may not take judicial notice of disputed facts:

In order for a fact to be judicially noticed under Rule 201(b), indisputability is a prerequisite. 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5104 at 485 (1977 & Supp. 1994). Since the effect of taking judicial notice is to preclude a party from introducing contrary evidence and in effect, directing a verdict against him as to the fact noticed, the fact must be one that only an unreasonable person would insist on disputing. *Id.* If it were permissible for a court to take judicial notice of a fact merely because it had been found to be true in some other action, the doctrine of collateral estoppel would be superfluous. *Id.* at 256-57 (footnote omitted). Moreover, to deprive the party of the right to go to the jury with his evidence where the fact was not indisputable would violate the constitutional guarantee of trial by jury. *Id.* at 485. *Accord United States v. Aluminum Co. of America*, 148 F.2d 416, 446 (2d Cir. 1945)(L. Hand, J.). … It is recognized that a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the facts of such litigation and related filings. Accordingly, a court may take judicial notice of another court's order for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the litigation.

*Id.* at 1553.

Finally, "[a] court's authority to take judicial notice under Rule 201 is limited to notice of adjudicative facts, … which are defined as the facts of the particular case … which relate to the parties. A court may thus refuse to take judicial notice of facts that are irrelevant to the proceeding." *Martincek* at *2. (internal citations and alterations omitted). *See also Falcon*, 957 F. Supp. at 1584-85 (because the Advisory Committee Notes to Rule 408 "define adjudicative facts as the facts of the particular case ... which relate to the parties[,] ... a court may refuse to take judicial notice of facts that are irrelevant to the proceeding or (in certain contexts) otherwise excludable under the Federal Rules") (citations and internal quotation marks omitted).

**(b)    "Incorporation by reference" exception**

A district court may consider an extrinsic document even on a Rule 12(b)(6) review if the complaint references it and several other requirements are met. In *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007), the Eleventh Circuit held that courts should "not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss [pursuant to Rule 12(b)(6)]." *Id*. "[H]owever," the court explained, there is an exception "in cases in which [1] a plaintiff refers to a document in its complaint, [2] the document in central to its claim, [3] its contents are not in dispute, and [4] the defendant attaches the document to its motion to dismiss." *Id. See also Legacy Entertainment Group, LLC v. Endemol USA, Inc.*, 2015 WL 12838795 (M.D. Fla. Oct. 1, 2015)("In ruling on a motion to dismiss, a court may only consider extrinsic evidence attached to the motion [to dismiss] when that evidence has been 'incorporated by reference' into the pleading. In other words, "if the documents' contents are alleged in a complaint and no party questions those contents, [the Court] may consider such a document provided it meets the centrality requirement." (internal citations omitted)(alterations in original)(citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

As noted above, the defendants offer in their motion to dismiss a myriad of facts that are not pled in the second amended complaint, and they rely upon extrinsic evidence to support the existence of those facts.[14] Because it is possible that an exhibit could be

---

[14]   By the court's count, the "facts" section of defendants' motion to dismiss contains over 80 citations to extrinsic materials.

considered for the purposes of one fact, but not considered for the purposes of another, the court has been compelled to address each of defendants' facts – to the extent that they are based on extrinsic evidence, rather than on the second amended complaint – individually.

Before proceeding with this task, the court notes that it has not overlooked the fact that defendants did not attach a single document to their motion to dismiss, much less the documents upon which they rely. The defendants also failed to incorporate these documents by reference expressly. Rather, defendants simply cited documents filed as exhibits to its brief in support of its motion to dismiss the original complaint (doc. 11), exhibits attached to the first amended complaint (doc. 19), and exhibits attached to the brief in support of their motion to dismiss the second amended complaint – three documents that were rendered moot by the filing of the second amended complaint. Defendants' failure to attach these documents to the motion to dismiss arguably precludes the application of incorporation by reference doctrine, which requires that a defendant attach any document it seeks to incorporate to its motion. However, assuming without deciding that defendants' failure to attach the relevant documents to the instant motion to dismiss is not preclusive, the court will address the applicability of the doctrine as to these documents. The court proceeds fact by fact.

(a) "Plaintiff had been drinking … with his wife." *See* doc. 55 at 2 (citing doc.11-1). Plaintiff did not allege that he had been drinking with his wife prior to her leaving their home on the date in question. In support of this assertion, defendants offer plaintiff's sworn testimony during his underlying criminal trial in the Circuit Court of Dale County, Alabama and cite the transcript of that proceeding. Even assuming this proposed fact is

relevant, the court will not consider it. While a court may take judicial notice of a public record, it may not do so for the truth of the facts recited therein. *See Jones* at 1553. *See also Lawson v. Gregg*, 2014 WL 12519805, *4 (D. Alaska Aug. 25, 2014)(holding that while the court could take judicial notice of "matters of public record," that it could not take judicial notice of factual assertions stated in a hearing transcript from a corresponding criminal case); *Presby Const., Inc., v. Clavet*, 2001 WL 951375, *1 (D.N.H. 2001)(holding that defendant's request that it consider plaintiff's testimony in a prior proceeding in ruling on a motion to dismiss was beyond the scope of judicial notice because it seeks notice of the truth of the truth of the statements, not just the fact that the statements were made).

The incorporation by reference exception does not compel a different result. Plaintiff does not mention the transcript in the second amended complaint and does not appear to rely on it any way. *See Fin. Sec. Assurance, Inc.* at 1284 (holding that there is an exception if "[1] a plaintiff refers to a document in its complaint …" and other factors are met). Therefore, this fact has not been considered.

(b) "The dispatcher told the officers that guns were involved." *See* doc. 55 at 3 (citing docs. 11-1 and 19, ex. B). Plaintiff alleges exactly the opposite, expressly stating that although dispatcher Beal "communicated to Partridge and Arias that this was a routine dispute and that the caller [had] reported … there were weapons in the house," "there was no indication that weapons were involved in the domestic disturbance." In support of their assertion of this fact, defendants offer plaintiff's sworn testimony in his criminal trial and the video taken from Officer Partridge's vehicle. For the reasons stated above, the court will not take judicial notice of plaintiff's or the officers' sworn testimony in the underlying

criminal proceeding, as it is clearly being offered for the truth of the matter asserted. The court likewise declines to take judicial notice of the video. Assuming, for the sake of argument, that this video is a "document" or even a "public record" merely because it was filed into the state court record, defendants are clearly offering it for the truth of its contents. Moreover, plaintiff disputes that the dispatcher told the officers guns were involved in the domestic disturbance. *See Lawson at* \*4 ("[A] court may not take judicial notice of a fact that is subject to a reasonable dispute, including a disputed fact stated in a public record.")(internal citations omitted).

The incorporation by reference doctrine is also unavailing as to both the transcript and the video. As stated above, plaintiff does not reference or otherwise rely on the transcript and, even if he did, as to this fact, its contents are disputed. *See Fin. Sec. Assurance, Inc.* at 1284 (holding that there is an exception if, among other factors, "[3] its contents are not in dispute…"). With regard to the video, plaintiff alleges as follows: (1) the officers "knew their vehicles could not video record what happened on plaintiff's front porch from their vehicles," *see* doc. 51 at 17; (2) "Arias and Partridge knew Partridge's car camera was recording the audio of their verbal interaction and communication with plaintiff immediately after the shooting," *see id.* at 18; (3) "Arias and Partridge knew and understood the audio recording of their verbal interaction and communication with plaintiff would be reviewed during the … investigation … and would be considered evidence … ," *see id.*; and (4) "In making certain post-shooting comments about the shooting that were false, Arias and Partridge took advantage of the fact that there … was no video recording of the shooting, and that they – but not plaintiff – knew that their statements and

communications immediately after the shooting were being audio recorded," *see id.* at 18-19.

Despite these technical references to the existence of a camera that had the capacity to record video and/or audio, the court is not satisfied that plaintiff has sufficiently referenced the contents of the video/audio[15] – and certainly not the portion of the video/audio to which defendants cite – much less *relied* on its content, for purposes of the incorporation by reference doctrine. *See Brown v. Newton County Sheriff's Office*, 273 F.Supp.3d 1142 (N.D. Ga. Aug. 7, 2017)(even where defendant attached exhibits to the complaint and "rel[ied] on some information within th[e] documents," because "he dispute[d] certain information," "for the purposes of th[e] motion [to dismiss]," the court "only consider[ed] the portions of the attached documents that [plaintiff] *expressly relie[d] upon* and d[id] not dispute.")(emphasis added) *Cf. Nelson v Lott,* 2018 WL 3557423, *3, fn. 7 (N.D. Ala. July 24, 2018)(even where plaintiff failed to attach a "bodycam" video and medical report, but such failure, at least at the "bodycam," was attributed to a clerical error, and plaintiff "clearly referred to" those exhibits, the court could consider both in ruling on the motion to dismiss); *Davis v. Clayton*, 2018 WL3475438, *3 (N.D. Ala. Jul. 19, 2018)(considering bodycam footage on a motion to dismiss because plaintiff "reference[d] the video throughout their complaint, the video was "central to plaintiffs' claims as [they stated] their allegations [were] firmly based on what they [had] seen in the video," the

---

[15]  Plaintiff does not, for example, summarize any portion of the audio recording or otherwise identify any particular statement or action of any person and state that it was captured on the audio recording.

claim arose from defendants' actions directly recorded in the video, and "neither party dispute[d] the accuracy of the video."). Thus, the court will not consider the video to have been incorporated by reference.

However, even assuming that plaintiff made adequate reference to the video/audio to trigger application of the doctrine, the court is still prohibited from considering this evidence as to this particular fact, as the fact is disputed – a point that defendants readily admit in their motion to dismiss. *See* doc. 55 at 3, fn. 2. ("Plaintiff disputes this point, but he ignores the video.")[16] Because "the contents are … in dispute," see *Fin. Sec. Assurance, Inc.* at 1284, the video/audio cannot be considered for the purposes of admitting this fact. *See Brown,* 274 F.Supp.3d 1142 (even where defendant attached exhibits to the complaint and "rel[ied] on some information within th[e] documents," because "he dispute[d] certain information," "for the purposes of th[e] motion [to dismiss]," the court "only consider[ed] the portions of the attached documents that [plaintiff] expressly relie[d] upon and d[id] not dispute.")(citing *Fin. Sec. Assurance, Inc.*, 500 F.3d at 1284, for its holding that the contents of the extrinsic evidence upon which the movant relies must not be in dispute).[17]

---

[16]  Though the court's inquiry necessarily ends here, it also bears noting that even if the court could consider the portions of the video upon which defendants rely, it is not satisfied that they unequivocally stand for defendant's proposition that the dispatcher told the officers that guns were involved in the domestic dispute, as opposed to merely present in the home. Defendants state: "On the video, Officer Arias asked the dispatcher, 'Is [sic] there any Signal 6's involved?' (doc. 19, Ex. B at 03:48:57 to 03:49:01). The dispatcher responded, '10-4. *Advised they're in the house*. Signal 6 guns.' (doc. 19 Ex. B at 03:49:01 to 03:49:12.)." *See* doc. 55 at 3, fn. 2 (emphasis added). To accept defendants' invitation to "credit the video," *see id.*, the court would have to draw an inference in defendants' favor, which is clearly impermissible.

[17]  Defendants make much ado about plaintiff's attaching of some of the extrinsic materials upon which defendants rely to earlier versions of his complaint, as well as to responses to motions to dismiss those complaints. Plaintiff's attaching documents to earlier versions of the complaint,

(c) "Both officers were dressed in police uniforms that displayed badges and patches." *See* doc. 55 at 3 (citing doc. 11-1). Plaintiff's complaint is silent as to whether the officers' badges and patches were displayed. The court will not take judicial notice of this portion of the transcript, as it is being offered for the truth of the matter asserted. Moreover, as explained above, plaintiff does not reference or otherwise rely on the transcript; therefore, the incorporation by reference doctrine is inapplicable.

(d) "The front door had a peephole … ." *See* doc. 55 at 3 (citing doc. 11-1). Plaintiff does not allege that the door had a peephole. For the same reasons stated in (c), the court will not consider this portion of the transcript under either doctrine.

(e) "Both officers saw [p]laintiff point the gun at Officer Partridge." *See* doc. 55 at 3 (citing doc. 11-1). Plaintiff alleges that he never raised, aimed, or pointed his weapon at the officers. For the reasons stated in (c), the court will not consider this portion of the transcript under either doctrine. Moreover, because it is a disputed fact, the court cannot take judicial notice of it, *see Jones*, 29 F.3d at 1553 ("indisputability is a prerequisite"), or

---

which were rendered moot by the filing of subsequent version of the complaint, or to responses that were likewise deemed moot, is irrelevant to the determination of whether he is relying on those extrinsic documents in *this* iteration of the complaint. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277-78 (11th Cir. 2016)(finding the district court erred in summarily rejected plaintiff's argument that the court "should not consider the reports which had been attached to the first amended complaint but omitted from the second amended complaint," and in dismissing certain claims based on its consideration of those reports). Furthermore, to the extent defendants are attempting to advance a judicial estoppel theory, the court rejects the argument. *See id. at* 1278-79 ("We also reject the defendants' argument that the doctrine of 'judicial estoppel' prevents [plaintiff] from filing a second amended complaint that rejected the information contained in the reports he attached as exhibits to the earlier complaints. At a minimum, judicial estoppel requires a party's later position to be contradictory or clearly inconsistent from an earlier one.")(internal quotations and citations omitted).

consider it pursuant to the incorporation by reference doctrine. *See Fin. Sec. Assurance, Inc.* at 1284.

(d) "Plaintiff later testified: "I think it's possible that the gun could have been thought to be pointing at somebody, but it was not my intention to point the gun." *See* doc. 55 at 3 (citing doc. 11-1). Again, plaintiff alleges that he never raised, aimed, or pointed his weapon at the officers. For the reasons stated in (c), the court will not consider this portion of the transcript under either doctrine. Moreover, whether defendant pointed the gun at the officers is disputed, which precludes the court from considering this fact at this juncture.[18]

(e) "Both officers feared for their safety." *See id.* at 4 (citing doc. 11-1). Plaintiff's complaint is silent as to the officers' emotions during the event in question. For the reasons stated in (c), the court will not consider this portion of the transcript under either doctrine.

(f) "The audio recording from Officer Partridge's car camera reflects that [p]laintiff was ordered to drop the gun at least once before the first shot was fired." *See* doc. 55 at 4 (citing doc. 19, B). The "facts" section of plaintiff's complaint is silent as to whether the officers ordered him to drop the gun before the first shot was fired. However, later in his complaint, he states that "Arias and Partridge fired their weapons … without giving Howe

---

[18] Finally, it appears that defendants are attempting to demonstrate to the court that the allegations of the complaint differ from plaintiff's testimony under oath during the underlying criminal trial. Inconsistency is not a ground for dismissal or a basis for the court's consideration of extrinsic evidence on a motion to dismiss. *See Presby,* 2001 WL 951375 at *1 ("While the court may take notice of the fact that plaintiff's prior testimony is arguably inconsistent with his current averments, in order for the court to consider plaintiff's prior testimony as establishing facts (*i.e.*[,] as admissions), the motion to dismiss must be converted to a motion for summary judgment. The court declines to do so.").

any warning before they shot him." *See* doc. 51 at 28. The court declines to take judicial notice of the video for the purpose of considering this fact, as defendants are clearly offering it for the truth of its contents. Moreover, it is a disputed fact of which the court cannot take judicial notice.

The incorporation by reference doctrine is likewise unavailing. As previously discussed in subpart (b) of this section, the court is not persuaded that plaintiff sufficiently referenced the video and its contents so as to trigger the incorporation by reference doctrine. Even assuming that he has, the doctrine has no application here, as the fact is disputed.

(g)  "The shooting was over in three seconds."  *See* doc. 55 at 4 (citing doc. 19, Ex. B). Plaintiff does not allege in his complaint how many seconds elapsed from the time the officers began firing until they stopped. To the extent defendants argue that the court should take judicial notice of the video for the purpose of considering this fact, the court declines, as the fact is clearly being offered for the truth of the matter asserted. As to the incorporation by reference doctrine, even assuming the plaintiff sufficiently referenced the video and its contents, the court still declines to consider it. *See* subsection (b). Moreover, given plaintiff's silence on the matter, the fact is, for all intents and purposes, disputed.

(h)  "Officer Partridge's car camera recording reflects that the officers ordered [p]laintiff to drop the gun at least nine times after the last shot was fired." *See* doc. 55 at 4 (citing doc. 19, ex. B). The second amended complaint is silent as to whether the officers ordered plaintiff to drop his gun after the last shot was fired. For the reasons outlined in (g), the court declines to consider the video for the purposes of this fact.

26

(i) "The Second Amended Complaint does not allege that either officer fired any shots after [p]laintiff was no longer armed …, and the car camera audio proves they did not." *See* doc. 55 at 4 (citing doc. 19, ex. B). Defendants admit that plaintiff does not allege in the second amended complaint that he was shot after he was no longer armed. Accordingly, this proposed fact is irrelevant and the video will not be considered for this purpose.

(j) "The officers promptly secured the scene and immediately summoned medical attention for plaintiff." *See* doc. 55 at 4 (citing doc. 11-1). For the reasons stated in (c), the court will not consider this portion of the transcript under either doctrine.

(k) "After the shooting, Officer Arias saw marijuana on a table in [p]laintiff's living room." *See* doc. 55 at 4 (citing docs. 24-3; 24-4; 24-5). The second amended complaint contains no mention of marijuana. Defendants cite three exhibits which they argue support this claim – (1) the second page of an incident/offense report relating to the event in question (docs. 24-3 at 10; 24-4 at 10); (2) a "deposition" made for the purpose of securing a warrant against defendant for drugs seen in plaintiff's home during the event in question (docs. 24-3 at 11-12; 24-4 at 11-12); and (3) an affidavit for a search warrant which outlines the events in question (doc. 24-5 at 5). While a court may take judicial notice of a public record, it may not do so for the truth of the facts recited therein, *see Jones* at 1553, which is exactly what defendants are asking the court to do here. Further, these records contradict the allegations of the complaint and the court cannot take judicial notice of a public record

containing disputed facts,[19] even when that record is a police report. In *Gomez v. Lozano*, 2010 WL 11505113 (S.D. Fla. 2010), a sister district court explained the unique issues which arise when a court takes judicial notice of a police report in ruling on a motion to dismiss:

> Next, the police officers attempt to introduce the offense incident report of Mr. Gomez's arrest, arguing that I may take judicial notice of this public record even on a motion to dismiss. Here, the police officers err. Under the Federal Rules of Evidence, I can take judicial notice of adjudicative facts "if requested [to do so] by the party." FED. R. EVID. 201(d). At times, courts can take judicial notice of public records. But, to be considered an "adjudicative fact" capable of judicial notice, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id. 201(b). The offense incident report, written by one of the defendants, is not a source whose accuracy cannot be reasonably questioned. The police officers, after all, would have an incentive to cover any constitutional violation, assuming any constitutional violation occurred. Furthermore, the incident report contradicts Mr. Gomez's allegations, which I must accept as true.

*Id.* at *2. *See also Bryant v. Miami-Dade County*, 2011 WL 13223543, *3, n. 3 (S.D. Fla. Nov. 21, 2011)("The [c]ourt will not take judicial notice of the police incident report because it does not find its authenticity to be without question. Moreover, taking judicial notice of a document does not mean that the [c]ourt accepts the contents of the document as true.")

As to the incorporation by reference doctrine, plaintiff has in no way referenced or relied on these documents. Further, even if he had, the law of this Circuit concerning consideration of disputed police reports, even when a plaintiff incorporates them by

---

[19] For example, the reports state that plaintiff pointed his gun at Officer Partridge. *See* Docs. 24-5 at 5; 24-3 at 10; 24-4 at 10.

reference, is clear. If a plaintiff alleges that reports are substantively false, the records cannot be considered. In *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014), the Eleventh Circuit reversed a district court's order dismissing the plaintiff's excessive force claims against two law enforcement agents based on qualified immunity. In doing so, it refused to consider statements contained in a police report, despite plaintiff's having attached the report to the complaint, because plaintiff had alleged that the contents of the report were not truthful. It held:

> [w]here a civil rights plaintiff attaches a police report to his complaint and alleges that it is false … the contents of the report cannot be considered as true for the purposes of ruling on a motion to dismiss. Otherwise, officers sued under § 1983 could just attach police reports referenced in a civil rights complaint to their motion to dismiss and ask courts to consider the contents of those reports even if they contradicted the allegations of the complaint.

*Id.* at 1270. *See also Mighty v. Miami-Dade County*, 2015 WL 5031571 (S.D. Fla. Jun. 9, 2015)(holding that because plaintiff did not attach the incident report to her complaint and there was "simply no mention of this document" in the complaint and the contents of the report differed from plaintiff's account of the shooting giving rise to her claims, that the court would not consider the report in ruling on defendants' motion to dismiss).

In this case, plaintiff alleges that "during the post-shooting investigation, Arias and Partridge gave false reports to fellow officers, their supervisors and police investigators regarding the facts of the incident …", *see* doc. 51 at 19; "Partridge and Arias prepared false written statements or false written reports regarding the facts surrounding the shooting," *see id.* at 20; and "Partridge and Arias, as part of the described conspiracy to submit a false version of the events which caused the shooting, agreed to support the false

narrative in which [p]laintiff was alleged to be the aggressor and Partridge was the victim, and each made written and/or oral statements supporting this false narrative, and/or ignored evidence that contradicted this false narrative, and failed to provide investigators and prosecutors with exculpatory evidence that would have shown that [p]laintiff did not threaten the officers," *see id.* Plaintiff further alleges that "the arrest and criminal charges were the result of Arias and Partridge supplying false information to their supervisors and to state investigators and prosecutors," *see id.* at 21, and that "[b]ased on Partridge and Arias's false allegations, arrest and charges that claimed Plaintiff threatened them with serious harm with a gun, the State of Alabama prosecuted [him] on two separate menacing charges in the Circuit Court of Dale County, Alabama," *see id.* at 21-22. Thus, there is no doubt that plaintiff alleges that the contents of these reports is false. The court will not consider them.

(l) "Plaintiff exclaimed that he had an ounce of marijuana." *See* doc. 55 at 4 (citing docs. 19, ex. B; 24-5 at 5). Again, the second amended complaint does not mention marijuana. Defendants cite the video and the affidavit in support of the search warrant. The court declines to take judicial notice of the video for the purpose of considering this fact, as defendants are clearly offering it for the truth of its contents. The incorporation by reference doctrine is likewise unavailing. As previously discussed in subpart (b) of this section, the court is not persuaded that plaintiff sufficiently referenced the video and its contents so as to trigger the incorporation by reference doctrine. For the reasons stated in (k), the disputed search warrant affidavit will not be considered under either doctrine.

(m) "That same day, Detective Kyle Hale obtained and executed a search warrant for Plaintiff's residence." *See* doc. 55 at 4 (citing doc. 24-3 at 10-12; doc. 24-4 at 10-12; and doc. 24-5 at 4). Plaintiff makes no mention of a search warrant or search. Defendants cite the same incident reports discussed in (k), as well as a search warrant. *See* doc. 24-5 at 4. For the reasons discussed in (k), the incorporation by reference doctrine does not dictate consideration of these documents.

The court will not take judicial notice of the incident reports (docs. 24-3 at 10-12 and 24-4 at 10-12), which were addressed in subpart (k), because the only reference to Hale's execution of the warrant is in the narrative portion of the incident reports, a section which is disputed. *See* subpart (k). The court will, however, take judicial notice of the existence of the warrant (doc. 24-5 at 4) for the limited purpose of the proffered fact – *i.e.*, that the warrant was issued to "Investigator Kyle Hale, Enterprise Police Department." To the extent the search warrant is being offered for the truth of its contents – *i.e.*, that certain materials were, or were believed to be, in plaintiff's home – judicial notice will not be taken. *See* subpart (k).

(n) "When he executed the warrant, Detective Hale recovered two baggies of marijuana, a pair of hemostats, a grinder, a glass smoking device, and cigar cutter inside Plaintiff's home." *See* doc. 55 at 4-5 (citing docs. 24-3 at 9-12; 24-4 at 9-12; 24-5 at 6). Plaintiff does not mention a search of his home. In support of this fact, defendants cite police reports that contain the same disputed information as those discussed in subpart (k), *see* doc. 24-3 and 9-12 and 24-4 at 9-12), and a warrant return form, *see* doc. 24-5 at 6. For

the reasons discussed in (k), the incorporation by reference doctrine does not permit consideration of these documents.

The court will not take judicial notice of the incident reports (docs. 24-3, 9-12 and 24-4, 9-12), as they are being offered for the truth of their contents. Moreover, the content of these reports is disputed. The court will, however, take judicial notice of the warrant return (doc. 24-5) for the limited purpose of considering the fact that it exists and that Hale is listed as the person who executed it. *See Jones*, 29 F.3d at 1549 (permitting judicial notice of a document from another court proceeding "for the limited purpose of recognizing the 'judicial act' that order represents or the subject matter of the litigation."); *United States v. Warren*, 2009 WL 260977, *2 (when requested to take judicial notice of a video of an evidentiary hearing held in a state court case, holding it would take judicial notice that the hearing took place on a certain date, but would not take judicial notice of the testimony presented during the hearing, the exhibits tendered at the hearing, the arguments of the lawyers, or the rulings of the judge). To the extent the warrant is being offered for the truth of its contents – *i.e.*, that Hale found certain items when executing the warrant – judicial notice will not be taken.

(o)    "On February 18, 2013, Detective Buford Roberts signed two criminal complaints charging plaintiff with menacing under Alabama Code § 13A-6-23 (1975)." *See* doc. 55 at 40 (citing doc. 24-1 at 53; doc. 24-2 at 50). Plaintiff never specifically mentions these documents, although he alleges that after his discharge from the hospital, he was "immediately arrested on two separate charges of 'menacing' under Code of Ala. § 13-6-23" and that the charges asserted that "[he] committed the crime of menacing by

32

threatening Arias and Partridge with his gun." *See* doc. 51 at 21. To the extent that defendants argue he incorporated these documents by reference, the court still will not consider them because the information contained in the complaints is disputed. For example, the complaints state that plaintiff pointed his gun at the officers. *See* doc. 24-1 at 53; doc. 24-2 at 50. Therefore, the incorporation by reference doctrine is inapplicable.

The court will, however, take judicial notice of the complaints for the limited purpose of acknowledging their existence and for the following facts: that Chris Hurley is listed as the signator on both; that Harley and defendant Arias are listed as the "government's witnesses" on one; and that Harley and defendant Partridge are listed as the "government's witnesses" on another. Plaintiff alleges that "menacing charges" were brought against him and that Partridge and Arias were the "complaining witnesses." To the extent the complaints are being offered for the truth of their contents – *i.e.*, that plaintiff did what the complaints allege – the court declines to take judicial notice.

(p)   <u>"Based on the complaints, a magistrate issued warrants for Plaintiff's arrest."</u> *See* doc. 55 at 5 (citing docs. 24-1 at 54; 24-2 at 51). Defendants cite the warrants that were issued for his arrest on the complaints for menacing. Plaintiff never references these documents. Therefore, the incorporation by reference doctrine is inapplicable.

The court will take judicial notice of the warrants for the limited purpose of acknowledging their existence. Moreover, plaintiff alleges he was arrested on menacing charges. To the extent they are being offered for the truth of their contents – *i.e.*, to show that plaintiff actually committed the crime for which the warrant was issued – the court declines to take judicial notice.

(q)     "On February 21, 2013, Plaintiff was arrested on the warrants after he was discharged from the hospital." *See* doc. 55 at 5 (citing docs. 24-1 at 54 and 24-2 at 51). In support of this fact, defendants cite the same documents discussed in subpart (p); *i.e.*, the warrants that were issued for his arrest. Plaintiff never references these documents; therefore, the incorporation by reference doctrine is inapplicable.

The court will take judicial notice of the warrants for the limited purpose of acknowledging their existence and the fact that they are marked as having been executed. Moreover, plaintiff alleges that he was arrested on menacing charges. To the extent that the warrants are being offered for the truth of their contents – *i.e.*, to show that plaintiff actually committed the crime for which he was arrested – the court declines to take judicial notice.

(r)   "After a trial in the Dale County District Court, Plaintiff was convicted on both charges." *See* doc. 55 at 5 (citing docs. 24-1 at 94; 24-2 at 92). Plaintiff does not allege that he was tried or convicted in district court. Rather, he alleges that he was prosecuted in Dale County *Circuit* Court, where he was acquitted. *See* doc. 51 at 22. In support of this fact, defendants offer two identical Dale County District Court orders adjudging plaintiff guilty. Plaintiff does not reference these documents. Therefore, the incorporation by reference doctrine is inapplicable.

The court will, however, take judicial notice of the orders finding defendant guilty for the limited purpose of acknowledging their existence. To the extent they are being offered for the truth of their contents – *i.e.*, to show that plaintiff actually committed the crime for which he was convicted – the court declines to take judicial notice.

(s)  "Plaintiff appealed both convictions to the Dale County Circuit Court." *See* doc. 55 at 5 (citing docs. 24-1 at 2; 24-2 at 2). Again, defendant does not allege that he appealed his convictions to the Dale County Circuit Court; he alleges that he was tried and acquitted in that court. *See* doc. 51 at 22. In support of this fact, defendants offer two notices of appeal. Plaintiff does not reference these documents. Therefore, the incorporation by reference doctrine is inapplicable.

The court will, however, take judicial notice of the notices of appeal for the limited purpose of acknowledging their existence. To the extent they are being offered for the truth of their contents – *i.e.*, to show that plaintiff actually committed the crime for which he was convicted and then appealed – the court declines to take judicial notice.

(t)  "On November 19, 2014, Plaintiff was acquitted on both charges after a jury trial." *See* doc. 55 at 5 (citing docs. 11-1; 24-1 at 127; and 24-2 at 130). Plaintiff alleges that he was acquitted on both charges. He does not, however, reference the documents upon which defendants rely – *i.e.*, the trial court transcript (doc. 11-1), and two identical orders adjudging defendant not guilty (Docs. 24-1 at 127; 24-2 at 130). Therefore, the incorporation by reference doctrine is inapplicable.

The court will not take judicial notice of the transcript because it is being offered for the truth of the matter asserted. The court, will, however, take judicial notice of the orders of acquittal for the limited purpose of acknowledging their existence. To the extent they are being offered for the truth of their contents, the court declines to take judicial notice.

(u) "Plaintiff was also charged with possession of marijuana and with unlawful possession of drug paraphernalia." *See* doc. 55 at 5 (citing docs. 24-3 at 5; 24-4 at 5). Plaintiff alleges no facts relevant to this proffered fact. Defendants offer warrants of arrest for possession of drug paraphernalia (doc. 24-3 at 5) and possession of marijuana 2nd (doc. 24-4 at 5). Plaintiff does not refer to these documents in the second amended complaint; therefore, the incorporation by reference doctrine is inapplicable.

The court will take judicial notice of the warrants for the limited purpose of acknowledging their existence. To the extent they are offered for the truth of their contents – *i.e.,* to show that plaintiff actually committed the crimes for which he was charged – the court declines to take judicial notice.

(v) Detective Hale signed criminal complaints against Plaintiff on March 11, 2013. Plaintiff was arrested the same day. *See* doc. 55 at 5 (citing docs. 24-3 at 5, 7; 24-4 at 5, 7). Plaintiff alleges no facts relevant to these proffered facts. Defendants offer the same warrants referenced in (u), as well as arrest reports (doc. 24-3 at 7; 24-4 at 7). Plaintiff does not refer to these documents in the second amended complaint; therefore, the incorporation by reference doctrine is inapplicable.

The court will take judicial notice of the warrant and complaints for the limited purpose of acknowledging their existence. To the extent they are being offered for the truth of their contents – *i.e.*, to show that plaintiff actually committed the crimes for which he was arrested – the court declines to take judicial notice.

(w) On July 17, 2014, Plaintiff was convicted of those charges in the Enterprise Municipal Court. On July 24, 2014, Plaintiff appealed those convictions to circuit court."

*See* doc. 55 at 5 (citing 24-3 at 14, 2; 24-4 at 14, 2). Plaintiff alleges no facts relevant to these proffered facts. Plaintiff does not refer to these documents in the second amended complaint; therefore, the incorporation by reference doctrine is in applicable.

The court will take judicial notice of the warrants for the limited purpose of acknowledging their existence. To the extent they are being offered for the truth of their contents – *i.e.,* to show that plaintiff actually committed the crimes for which he was convicted and appealed – the court declines to take judicial notice.

In conclusion, to the extent stated above, the court will take judicial notice of the existence of certain documents, but not for the truth of their content. Of course, the defendants may challenge plaintiff's allegations using the extrinsic evidence, and any other evidence developed during discovery, subject to the applicable rules of evidence, at a later stage in these proceedings.

## V.   <u>Discussion</u>

Plaintiff alleges nine claims. The court will address each in turn.

### A.  **The federal claims against the individuals**

Defendants raise qualified immunity in response to each of the federal claims asserted against them. "Qualified immunity protects government officials performing discretionary duties from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gregory v. Miami-Dade County, Florida*, 719 F. App'x 859, 866 (11th Cir. Nov. 15, 2017)(quoting *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009)). For qualified immunity to apply, the official asserting the defense must show that, at the

time of the complained of conduct, he was acting within his discretionary authority." *Id.* (internal citations omitted). Here, there is no dispute that the officers were acting within their discretionary authority when they responded to the 911 call. *See* doc. 51 at 4-5 (alleging in the second amended complaint that defendants Partridge and Arias were "working in the line and scope of [their] duties as … police officer[s]" at the relevant time period.). The burden thus shifts to plaintiff to demonstrate that the officers are not entitled to qualified immunity. *See id.*

To overcome qualified immunity, plaintiff must show that (1) the officers "violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation." *Id.* (internal citations omitted). "Both elements of this test must be satisfied for an official to lose qualified immunity." *Id.* (quoting *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010). "A district court is granted the flexibility to decide those issues in either order, but the plaintiff must satisfy both requirements in order to negate the defendants' qualified-immunity defense." *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Maddox v. Stephens*, 727 F.3d 1109, 1120-21 (11th Cir. 2013); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012); *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).

"At the motion to dismiss stage in the litigation, the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." *Ledea v. Metro-Dade County Police Department*, 681 F. App'x 728, 729 (11th Cir. Feb. 27, 2017)(quoting *Keating v. City of Miami*, 598 F.3d 753, 760 (11th Cir. 2010)(internal quotation marks omitted). "Whether a particular complaint sufficiently alleges a clearly established violation of law cannot be

decided in isolation from the facts pleaded." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 673, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(internal quotation marks omitted)).

### i.      Fourth Amendment illegal seizure

In his second amended complaint, plaintiff argues that defendants Partridge and Arias were "working in the line and scope of [their] duties as … police officer[s]," *see* doc. 51 at 4-5, when they "illegal[ly] seized [him] without a warrant *by aggressively aiming their guns at [him]* as soon as [he] opened his door without any reasonable basis or probable cause to believe [he]: 1) had committed a crime; 2) was armed or violent; 3) represented a threat of danger to the officers or otherwise while standing in his own home; or 3) [sic] represented a risk of destroying evidence of a crime." *See id.* at 26 (emphasis added).

In their motion to dismiss the second amended complaint, defendants refer to this as the "[c]ount I – [t]drawn gun claim," *see* doc. 55 at 6, and argue that plaintiff has not alleged an "actual seizure, but only an attempted seizure, *see id.* at 6-7, and the officers "are entitled to qualified immunity because no clearly established law prohibited them from aiming their guns at plaintiff under these circumstances." *See id.* at 7-8. Specifically, defendants argue that because police officers are entitled to employ reasonable methods to protect themselves, the officers' decision to point their guns at plaintiff was justified and did not run afoul of the Fourth Amendment. *See id.* at 8. Further, defendants argue that "plaintiff cannot identify controlling precedent which clearly establishes that police officers cannot aim their weapons at a subject when they respond to domestic disturbance in which guns are reportedly involved." *See id.*

Plaintiff did not respond to any of the above arguments in his response to defendant's motion to dismiss the second amended complaint. *See* doc. 59. In his sur-reply (doc. 68), plaintiff attempted to rectify this failure by incorporating his response to defendants' motion to dismiss the *first* amended complaint, *see* doc. 30 at 12-24. However, the argument contained in plaintiff's earlier response is non-responsive to the instant motion to dismiss, at least as to this particular claim. Though the title of count one in plaintiff's first amended complaint is "illegal seizure" – just as it is in the second amended complaint – in the first amended complaint, the substance of the claim appears to be different. In the first amended complaint, rather than explicitly stating that the claim is based on the officers' pointing their guns at him, plaintiff simply alleges that defendants "illegally seized plaintiff without probable cause and without any basis for doing so," and that the "unconstitutional 'seizure' of plaintiff by [the officers] as described above [in 34 pages of factual allegations] proximately caused [him] to suffer injuries and damages … ." *See* doc. 18 at 35. If plaintiff intended his seizure claim to be limited to or include the officers' aiming their guns at him, he did not make plain his intent.

Accordingly, defendants' 130-page motion to dismiss to the first amended complaint never addresses the claim as such. For example, defendants' motion to dismiss the first amended complaint states that "counts I, II, and III focus on [p]laintiff's shooting," and specifically characterizes the seizure claim as one based on the shooting, not on the officers' aiming their guns. Defendants state that "Count 1 [of the first amended complaint] alleges [the officers] 'seized [p]laintiff without probable cause' when they shot him," *see*

doc. 24 at 31 (citing the first amended complaint), and then proceed to describe why the officers are entitled to qualified immunity from the shooting claims.[20] *See id.* at 31-59.

In his response to the motion to dismiss the first amended complaint, plaintiff does not contest defendants' interpretation of the nature of this claim, and responds in kind. While he argues that the *first* amended complaint "properly stated claims under the Fourth Amendment for unconstitutional seizure and deadly force," plaintiff does not clarify that his seizure claim is based on the officers' pointing their guns at him, whether in lieu of or in addition to their shooting him, and focuses his argument on the latter. Moreover, while he cites two cases which address whether pointing a gun effects a seizure, *see* doc. 30 at 12, 20-21 (citing *Clark v. City of Atlanta*, 544 F. App'x 848, 853 (11th Cir. 2013)("a seizure occurs when an officer restrains an individual's liberty by means of physical force or a show of authority, including pointing a gun at that individual"), and doc. 30 at 17 (citing *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)("[P]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force."), plaintiff falls short of presenting a developed argument as to why the officers pointing their guns at him under these circumstances constituted an "illegal" seizure, and further, how his right to be free from such a seizure was clearly established at the time.

---

[20] In their motion to dismiss the first amended complaint, defendants state that plaintiff's seizure, excessive force, and second amendment claims are all based on plaintiff's shooting and they appear to have addressed all the claims together.

It is plaintiff's obligation to oppose defendant's arguments if he disagrees with them. Despite plaintiff's having two bites at the apple – both in his response and his sur-reply – he has failed to put forth argument to counter the motion to dismiss the illegal seizure claim as it is characterized in the second, rather than the first, amended complaint – *i.e.*, as a "drawn gun" claim. *See, e.g.*, *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)("[J]udges are not like pigs, hunting for truffles in briefs.")(citation omitted); *Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002)(internal quotation omitted)("Judges need not paw over the files without assistance from the parties."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"); *Ploof v. Ryan*, 2016 WL 393583, *1, n.1 (D. Ariz. Feb. 2, 2016)(where plaintiff incorporated previous argument by reference, stating that "[i]t is plaintiff's obligation to oppose defendants' arguments, not the court's obligation to attempt to ascertain what arguments from other motions Plaintiffs may be trying to make."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000)("[i]t is not for the court to manufacture arguments on plaintiff's behalf").

Absent such argument, plaintiff has waived or abandoned the claim, and the appropriate disposition is dismissal. *See, e.g., Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006)(finding that plaintiff abandoned claim by failing to defend it in response to a motion to dismiss); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000)(finding that party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned); *Kirkland*

*v. County Com'n of Elmore County, Ala.*, 2009 WL 596538, *2 (M.D. Ala. Mar. 6., 2009) (collecting cases and granting motion to dismiss where plaintiff had not filed a brief in opposition).

Alternatively, the claim is due to be dismissed on qualified immunity grounds. Plaintiff does not dispute that the officers were acting within their discretionary authority. *See* doc. 51 at 4-5 (alleging in the second amended complaint that defendants Partridge and Arias were "working in the line and scope of [their] duties as … police officer[s]" at the relevant time period.). Therefore, once defendants raised qualified immunity, the burden shifted to plaintiff to show that they violated clearly established law. Plaintiff has failed to do so.

First, plaintiff has not explicitly argued why defendants are not entitled to qualified immunity from the drawn gun claim.[21] At best, the court might cobble together plaintiff's

---

[21] *See, e.g., Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)("Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity")(internal citations omitted); *Weir v. Jefferson County Commission*, 2011 WL 13285139, *7 (N.D. Ala. Jan. 20, 2011)("The plaintiff provides no argument on this issue and therefore has not carried her burden. Accordingly, this defendant is entitled to qualified immunity."); *Wall-DeSoua v. Johnson*, 2016 WL 9444142, *5 (M.D. Fla. Jan. 19, 2016) ("What is clear is that Plaintiffs bear the burden of showing that, based on the allegations of the [s]econd [a]mended [c]omplaint, Defendants violated a clearly established constitutional right; it is equally clear that Plaintiffs have made no genuine attempt to do so, thereby failing to satisfy their burden. The result is that Defendants are entitled to qualified immunity, and this case will be dismissed."); *Carruth v. Bentley*, 2018 WL 1993257, *15 (N.D. Ala. Apr. 27, 2018)(appeal filed, *Carruth v. Byrne, Jr., et al.*, No. 18-12224 (11th Cir. filed Aug. 25, 2017)("Although defendants have asserted in their motion to dismiss that they are entitled to qualified immunity on all of [plaintiff's] claims, [plaintiff] has made no argument as to why Defendants are not entitled to qualified immunity in regards to his conspiracy claim. [Plaintiff] has therefore not met his burden. … [plaintiff's] conspiracy claim is due to be dismissed.")(internal citations omitted).

statements in his response to the motion to dismiss the first amended complaint that (1) drawing a gun effects a seizure, *see* doc. 30 at 12; (2) an officer conducting an investigatory stop must have reasonable suspicion to effect a seizure, *see id.* at 12; and (3) the "defendant officers had no reasonable justification for readying their guns and pointing them at the door in the first place," and piece these together with his arguments about why the *shooting* was unjustified – *i.e.*, that "plaintiff had not committed any crime and was neither suspected of, nor had any history of, violent behavior; he did not pose a threat to the officers simply by opening the door to his own home holding a gun pointed at the floor; and he never attached or resisted the officers, *see id.* at 14 – to construct for plaintiff an argument that the officers lacked reasonable suspicion to point their guns at him. However, considering the facts as pled by plaintiff, this argument would still fail to rebut the officers' assertion of qualified immunity.

The court agrees that when the officers pointed their guns at plaintiff, they effected a seizure, *see Clark*, 544 Fed. Appx. at 853 ("We agree with the district court … that the seizure occurred when the officers got out of their car with their guns drawn … ."). For qualified immunity purposes, the question is whether the officers had *arguable* reasonable suspicion to do so. *See id.* ("[W]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.")(citing *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000)). Reasonable suspicion exists when "the totality of the circumstances create[s], at least, some minimal objective justification for the belief" that plaintiff is "engaged in unlawful conduct." *Id*. Reasonable suspicion is determined from

the totality of circumstances and collective knowledge of the officers, and an officer who reasonably, but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity. *See id.* (citing *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) and *Jackson*, 206 F.3d at 1166).

Taking plaintiff's facts as true, the officers had at least *arguable* reasonable suspicion for the seizure – that is, arguably some minimal objective justification for the belief that criminal activity was afoot. The complaint demonstrates that, at the moment of the seizure, the officers were aware of a 911 call that reported a domestic disturbance, they were at the house where the domestic disturbance had allegedly occurred, they were aware that the owner of the home had guns in the house, and plaintiff answered the door with a gun in his hand.[22] Accordingly, based on the totality of these circumstances, the officers had "at least *arguable* reasonable suspicion that [plaintiff] might have been engaged or were about to engage in criminal activity." *See id.* at 854 (emphasis added).

Moreover, while plaintiff does not expressly argue that it did, the stop did not mature into an arrest when the officers brandished their weapons. *See id.*; *United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983)("an officer's display of weapons does not necessarily

---

[22]   In addition, given the officers' arguable reasonable suspicion that plaintiff might have been engaged, or about to engage, in criminal activity, and their understanding that he had guns in the home, it was reasonable for the officers to believe that plaintiff might come to the door with a gun – a point plaintiff expressly alleges in the complaint. *See* doc. 51 at 23-24 (alleging that "Arias and Partridge knew that a large number of individuals in Dale County, Alabama own guns and that gun-owners are likely to bring a gun with them to the door when startled and alarmed for their own safety by loud knocking by anonymous persons in the middle of the night," and that the officers "knew it was foreseeable that [plaintiff] may be alarmed when they knocked loudly on his door …,  and that since they also knew he was a gun-owner, there was a risk that [he] would come to the door with a gun in his hand as allowed by the Second Amendment.").

convert an investigatory stop into an arrest"). Further, the court cannot overlook the facts that the officers were responding to call in the middle of the night and, by plaintiff's account, the neighborhood and the area around the front door were dimly lit. Taking all of these factors into consideration, the officers were "justified in drawing their weapons for their own protection until they could determine whether [plaintiff] posed a threat to them or anyone else." *See Clark* at 854 (citing *United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983)("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection."); *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991)("[t]he use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest, and … police may take reasonable action, based on the circumstances, to protect themselves."). *See Clark* at 854 ("We agree with the district court that given the officers' arguable reasonable suspicion that the [plaintiffs] might have been engaged, or were about to engage in criminal activity, and that [plaintiff] was standing with his hands in his pockets, it was reasonable for the officers to believe that [plaintiff] might have been carrying a weapon" and they were justified in exiting their car with guns drawn for their own protection).

In conclusion, under the facts pled by plaintiff, the officers "had arguable reasonable suspicion of possible criminal activity," could reasonably anticipate that plaintiff would answer the door with a gun, and were "justified in coming onto the property with their guns drawn [for their own protection] to make an investigatory stop in order to determine whether or not [plaintiff was] engaging in or about to engage in criminal activity." *See Clark at 854.* Accordingly, plaintiff has failed to allege plausibly that Arias and Partridge

violated his Fourth Amendment rights. Because the complaint fails to allege the violation of a constitutional right, qualified immunity applies. *See Alexander v. Hale*, 2018 WL 1157202, *2 (N.D. Ala. Mar. 5, 2018)("A defense of qualified immunity 'may be raised and addressed on a motion to dismiss, and will be granted if the complaint 'fails to allege the violation of a clearly established constitutional right.'")(quoting *Smith v. Siegelman*, 322 F.3d 1290, 1294 (11th Cir. 2003)(quoting, in turn, *Chesser v. Sparks*, 248 F.3d 1117 (11th Cir. 2001)). This claim is due to be dismissed.[23]

### ii.      Fourth Amendment excessive force

In count two, Plaintiff alleges that Partridge and Arias "intentionally exercised deadly force by shooting their guns without any objectively reasonable justification to do so." *See* doc. 51 at 27-28. Plaintiff specifically alleges that the officers "fired their weapons at [plaintiff] when he opened his door and while he was in his own home without any probable cause to believe [plaintiff] posed an immediate threat of serious physical harm to either of the officers, and without giving [plaintiff] any warning before they shot him." *See id*. at 28. Defendants assert their entitlement to qualified immunity. Defendants further argue that the shooting was justified and constitutionally permissible because the officers had probable cause to believe their lives were in danger, and that plaintiff has failed to demonstrate that law clearly established at the time prohibited their

---

[23]   Even assuming that the officers' aiming their guns at plaintiff amounted to a constitutional violation, plaintiff has not shown that there was clearly established law on the date in question that prohibited the officers from pointing their guns at the plaintiff under these circumstances. Thus, even if the court found that plaintiff had sufficiently alleged the violation of a constitutional right, he has failed to meet his burden as to the "clearly established" prong, and qualified immunity is appropriate.

shooting him under these circumstances. *See* doc. 55 at 8-23. It is undisputed that the officers were acting within their discretionary authority; therefore, plaintiff must demonstrate that they violated a clearly established right.

### a.  Constitutional violation

"The first inquiry in reviewing the claim alleged in count [II] of plaintiff's complaint is to determine whether [h]e has "sufficiently alleged a constitutional or statutory violation.'" *Nelson v. Lott*, 2018 WL 3557423, *10 (N.D. Ala. Jul. 24, 2018)(quoting *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1305 (11th Cir. 2009). "Without a … violation, there can be no violation of a clearly established right." *Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir. 2003). "Freedom from unreasonable searches and seizures under the Fourth Amendment 'encompasses the right to be free from excessive force during the course of a criminal apprehension.'" *Mobley v. Palm Beach County Sheriff's Department*, 783 F.3d 1347, 1353 (11th Cir. 2015)(*per curiam*)(quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the court of an arrest.").

"Apprehension by the use of deadly force is a seizure … ." *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)(internal quotation marks

omitted). In determining the reasonableness of the force applied, courts 'look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Young v. Borders*, 2014 WL 11444072, *14 (M.D. Fla. Sept. 18, 2018)(*affirmed*, 620 F. App'x 889 (11th Cir. 2015); *motion for rehearing denied*, 850 F.3d 1274 (11th Cir. 2017)(quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)(citing *Scott v. Harris*, 550 U.S. 372, 382, 127 S.Ct. 1769, 1777, 167 L.Ed.2d 686).

"[T]he reasonableness of the officer's actions is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Clark*, 544 F. App'x at 855 (internal quotations and bracketing omitted)(quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)(internal citations omitted)). "In the deadly force context, the Eleventh Circuit has observed that a police officer may constitutionally use deadly force when the officer: (1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Young* at *14 (quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013)(quoting, in turn, *Vaughan v. Cox*, 343 F.3d 1323, 1329-

30 (11th Cir. 2003)). "Although these factors are useful, courts cannot apply them mechanically." *Young*, 2014 WL 11444072 at *14 (citing *Penley v. Eslinger*, 605 F.3d 843, 849-50 (11th Cir. 2010)).

"The Eleventh Circuit has cautioned that courts are not to view the reasonableness of a particular use of force 'as judges from the comfort and safety of our chambers.'" *Young* at 14. (quoting *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333-34 (11th Cir. 2004)). "Rather than apply the '20/20 vision of hindsight,' *Graham*, 490 U.S. at 396 … the [c]ourt "must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction where inaction could prove fatal." *Id.* (quoting *Crosby* at 1334).

"Further, the Supreme Court has emphasized that there is no precise test or 'magical on/off switch' to determine when using excessive or deadly force is justified." *Id.* (quoting *Scott*, 550 U.S. at 382). "Nor must every situation satisfy certain preconditions before deadly force can be used." *Id.* (citing *Scott*, 550 U.S. at 382). "Rather, the particular facts of the case must be analyzed to determine whether the force used was justified under the totality of the circumstances, ... and courts 'must still slosh … through the factbound morass of 'reasonableness.'" *Id.* (quoting *Graham*, 490 U.S. at 396 and *Scott*, 550 U.S. at 383). Finally, "to be entitled to qualified immunity, 'an officer need only have arguable probable cause to employ deadly force.'" *Clark*, 544 F. App'x at 856 (citing *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002)).

Even accepting plaintiff's version of events, the court must still assess the reasonableness of the particular use of force from the perspective of a reasonable officer

on the scene. *Graham*, 490 U.S. at 396. The relevant facts, based on plaintiff's allegations alone, are as follows. The officers knew prior to their arrival at plaintiff's residence that there had been a 911 call regarding a domestic disturbance there. The officers also knew from the dispatcher that plaintiff had guns in the home. Moreover, according to plaintiff, given that the officers knew he was a gun-owner and lived in Dale County, Alabama, they could reasonably suspect that he would answer the door with a gun. The officers arrived at approximately 3:52 in the morning. It was dark. After they assumed tactical positions – Arias midway up the stairs leading to the dimly lit deck, and Partridge on the deck, beside the front door – Partridge knocked on the door seven times. After approximately seven seconds, plaintiff opened the door slowly. Plaintiff had a gun in his hand, Though it was pointed at the ground. Plaintiff saw the officers' guns pointed at him – Arias was more than ten feet away and there were five to six feet between plaintiff and Partridge – and immediately turned to retreat back into the home. The officers opened fire, hitting plaintiff twice in the back.  Plaintiff alleges that less than a second and a half expired from the time plaintiff stepped out from behind the door after he opened it until the time the officers began firing their weapons. Plaintiff never crossed the threshold onto the deck or stepped toward the officers and he never raised, aimed, or pointed his weapon at the officers. Neither plaintiff nor the officers said anything to each another prior to the shooting.

In this case, the reasonableness inquiry turns on the second of the *Graham* factors – the existence of an imminent threat to the officers' safety. *See Wilson v. Parker*, 2018 WL 3954222, *2 (11th Cir. 2018) ("[T]he decisive fact here is the threat of physical harm that [the decedent] posed to [one officer] at the time [a second officer] shot him."); *Penley*, 605

F.3d at 851 ("In this case, the reasonableness analysis turns on the second of these factors: the presence of an imminent threat."); *Young*, 2014 WL 11444072 at *15 ("Defendants' argument focuses on the second of the factors in the balancing test noted above; namely, whether [decedent] posed an immediate threat to the safety of the officers … The court agrees that the reasonableness analysis turns on this factor."). "If a reasonable officer could have believed under the circumstances that [plaintiff] 'posed a threat of inflicting serious injury or death' to [the officers], then 'the shooting was objectively reasonable regardless of whether [plaintiff] had already committed a crime or was resisting or attempting to evade arrest.'" *Wilson* at *2 (quoting *Shaw v. City of Selma*, 884 F.3d 1093, 1099 n.5 (11th Cir. 2018).

Considering the totality of the circumstances, it would not be unreasonable for an officer in Arias' and Partridge's position to believe that his or her life was in danger when the plaintiff opened the door with a gun – and for that belief to intensify once plaintiff turned back into the home – and, thus, to take immediate action in self-defense. "As the Eleventh Circuit has said, the [c]ourt 'must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Young*, 2014 WL 11444072 at *15 (quoting *Crosby*, 394 F.3d at 1334). The officers knew that a domestic disturbance had been reported at the home. They also knew that plaintiff had guns in the home. It was reasonable for the officers to believe, in that split second, that the man who answered the door was the one who had been involved in that domestic disturbance. Moreover, given that plaintiff answered the door with a gun, it was reasonable

for them to believe that he was dangerous. Further, after plaintiff opened the door, he immediately turned to retreat back into the house. It would be reasonable for the officers to have believed that the plaintiff was retreating to assume a better or less exposed position from which to fire his weapon.[24] Given these facts, it is reasonable for the officers to have believed their lives were in danger.

While plaintiff alleges that he did not point his gun at the officers or advance toward them, these facts do not change the outcome. "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to stop the suspect," and the court is unwilling to hold that the officers were unreasonable in not waiting to see if plaintiff would raise the gun in their direction. *Id.* (citing *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether [the defendant had drawn his gun, [the defendant's] gun was available for ready use, and [the officer] was not required to wait 'and hope[] for the best.'")(quoting *Scott*, 550 U.S. at 385)). *See also Wilson*, 2018 WL 3954222, *2 ("Although [the decedent] did not point the stick at Thompson or raise it to swing it, the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *Shaw*, 884 F.3d at 1100 (holding that an officer did not use excessive force in shooting a suspect who was carrying a hatchet and approaching the officer because, even

---

[24] Plaintiff urges the court to consider that he retreated out of fear for his own life; however, neither his nor the officers' subjective motivations or beliefs is relevant to the objective reasonableness inquiry.

though the hatchet was not raised at the time of the shooting, the suspect "could have raised [it] in another second or two and struck [the officer] with it.").

Plaintiff's arguments about the officers' failing to warn him before they opened fire are likewise unpersuasive. By plaintiff's own account, only one and half seconds passed between his opening the door and his being shot in the back. Given what occurred during this second and a half – *i.e.*, plaintiff's opening the door while holding a gun, and then immediately turning back into the home – the court declines to hold that these officers acted unreasonably by not warning plaintiff prior to opening fire. *See Garner,* 471 U.S. at 11-12 (requiring a warning before using deadly force *if feasible); Carr v. Tatangelo*, 338 F.3d 1259, 1269, n.19 (11th Cir. 2003)(quoting and agreeing with the Fourth Circuit's holding in *McLenagan v. Karnes*, 27 F.3d 1002, 1007-8 (4th Cir. 1994), in which it declined "to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing – particularly where, as here, such a warning might easily have cost the officer his life.").

The holding of a sister district court in *Young v. Borders*, 2014 WL 11444072 (M.D. Fla. Sept. 18, 2014), *aff'd*, 620 F. App'x 889 (11th Cir. 2015), bolsters the court's conclusion that the officers did not commit a constitutional violation in shooting the plaintiff. While the facts are not identical to the case at bar, they are close. They are as follows:

> Here, the officers were seeking information about a speeding motorcyclist who did not stop after Deputy Sylvester activated his emergency lights and initiated a pursuit. After Sylvester's commander called off the pursuit, Sylvester learned that the motorcyclist could be the same person being sought by the Leesburg Police Department that evening.

Sylvester also learned that this individual could be armed. Deputy Brocato conveyed this same information to the deputies on the scene at the Blueberry Hill Apartments. Brocato told the officers present at the apartment complex that he had heard over the Leesburg Police Department radio that a motorcycle fled from the Leesburg Police, a felony, and that the matter involved an assault and battery with a loaded firearm. While the occupants of Apartment 114 *were not suspects*, due to the location of the motorcycle and the lights being on inside that apartment, it was reasonable for the LCSO officers to believe that a suspect could be in Apartment 114 or that the occupants might have information about the motorcyclist.

As the officers approached and took positions outside Apartment 114, Brocato *reminded the officers that the motorcyclist might be armed*. When Sylvester knocked on the door, he stood to the left of the doorframe and about sixteen inches lower than the threshold. Immediately before the door opened, Sylvester overheard a small part of the conversation with Dorrier and heard someone say, "he lives over there." However, there is no evidence to show that Sylvester knew where "over there" was because immediately thereafter Scott opened the door.

Even if the door opened "at a medium speed" and *Scott held his gun pointed down*, the two were standing immediately across the threshold of the door from each other. Sylvester said, "gun!" and possibly uttered something along the lines of "drop the gun!" or "show me your hands." Regardless of precisely what was said, it is undisputed that the events, from the time the door opened until the time shots were fired, *took place rapidly within two to three seconds*. According to Sylvester, *after the door opened, Scott began closing the door and "edging behind it,"* which Sylvester perceived as an attempt to take cover so that Scott could fire on Sylvester. Sylvester fired his gun six times and the last round "hit the door jamb" and Sylvester could not go any further to his left. Sylvester entered the apartment to "further engage" Scott and went immediately left because he knew that Scott had gone to the left. After Sylvester entered, he saw Scott slumped on the couch with the gun on the couch beside his left hand.

*Id*. at 15–16 (emphasis added).

The officers ultimately determined that Scott, who died from shots fired by the officer, had no connection to the motorcyclist or the alleged crimes. The motorcycle had simply been parked outside his apartment. This notwithstanding, the court determined that

the officers were entitled to qualified immunity because there was no constitutional violation, explaining  that "in light of the information [the officer] had at the time the door opened, as well as the tense, uncertain, and rapidly evolving situation [the officer] confronted when [the decedent] opened the door wielding a gun, the Court concludes that in the totality of the circumstances – even if the gun was pointed down – [the officer's] use of deadly force was reasonable and it declines to second-guess his split-second judgment." *Young* at *18. The Eleventh Circuit affirmed the court's decision, finding "no reversible error in the court's ultimate qualified immunity rulings," *see Young*, 620 F. App'x. at 890, and later denied a motion for a rehearing *en banc*, *see Young*, 850 F.3d 1274.

The facts in this case are very similar to those in *Young*, and some of the facts present the court with an even firmer basis for finding that plaintiff has failed to allege a plausible constitutional violation. First, while the officers in *Young* did not know whether the suspect about whom they were seeking information was even inside the apartment whose door they knocked on, Arias and Partridge knew that a 911 caller had reported a domestic disturbance at this very home. This raised the level of threat to a higher degree than in the *Young* case. Second, while the officers in *Young* suspected that a someone who had used a gun in the commission of an offense could be in the apartment, which necessarily raises the suspicion that a gun is in the apartment, in this case the officers knew there were guns in plaintiff's home and, according to plaintiff, that he was a gun-owner and would likely answer the door with a gun. Third, like the decedent in *Young*, plaintiff answered the door with a gun pointing down and never raised it at the officers. Moreover, much like the decedent in *Young* – who, after seeing the officers, began to close the door and edge behind it – plaintiff

56

began to turn back into the house immediately after seeing the officers. Finally, as in *Young*, the relevant events took place in a matter of seconds. Given the substantial similarities in these two cases, the court is persuaded by the *Young* court's decision, and the circuit court's affirmance, that the officers' use of deadly force in this case was reasonable given the imminent threat to their lives.

Ultimately, in the moment that plaintiff appeared in the doorway with a gun, and then attempted to retreat, it was reasonable for the officers to have "feared for [their] own li[ves] and have perceived an imminent threat of death or serious bodily injury.'" *Young*, 2014 WL 11444072 at *15 (citing *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003)(holding that the Constitution permits the use of deadly force against a person who poses an imminent threat of danger to a police officer or others)). "Even if the situation could have been handled better – a proposition that is by no means certain – '[the court] is mindful that officers make split-second decisions in tough and tense situations' and '[the court is] loathe to second guess decisions made by police officers in the field.'" *Wilson*, 2018 WL 3954222 at *4. Because the court finds that plaintiff has failed to plead facts that plausibly establish that the officers committed a constitutional violation, the officers are entitled to qualified immunity. This claim is due to be dismissed.

### b.  Clearly established law

Even if the court had not determined that plaintiff failed to allege a constitutional violation, Arias and Partridge would still be entitled to qualified immunity because plaintiff has failed to meet his burden of demonstrating that the officers violated a right that was clearly established on the date in question.

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, __ U.S. __ , 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017)(per curiam)(quoting *Mullinex v. Luna*, __ U.S. __, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)(per curiam). "Whether the law is clearly established is not defined at 'a high level of generality.'" *Gregory v. Miami-Dade County, Fla.*, 719 F. App'x 859, 868 (11th Cir. 2017)(quoting *id*. at 137 S.Ct. at 552 (quoting, in turn, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 2084, 170 L.Ed.2d 1149 (2011)).

"For that reason, a clearly established right is one that is sufficiently clear that *every reasonable official* would have understood that what he is doing violates the right." *Gregory* at 868 (internal quotation marks omitted)(emphasis in original)(quoting *Mullinex*, 136 S.Ct. at 308)(internal citations omitted)). "In other words, police officers must have 'fair and clear warning of what the Constitution requires." *City & Cty. of San Francisco v. Sheehan*, __ U.S. __, 135 S.Ct. 1765, 1778, 191 L.Ed.2d 856 (2015)(quoting *Ashcroft*, 563 U.S. at 746).

"Consequently, the reasonableness of the officer's conduct 'is judged against the backdrop of the law at the time of the conduct.'" *Nelson*, 2018 WL 3557423 at *12 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)(per curiam)). "That standard does not require 'exact factual identity with a previously decided case, … but the unlawfulness of the conduct must be apparent from pre-existing law.'" *Id*. (brackets omitted)(quoting *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)(en banc)).

58

"Even though Supreme Court precedent does not require a case directly on point in order to say that the unlawfulness of particular conduct was 'clearly established' on the date of the injury in question, 'existing precedent must have placed the statutory or constitutional question beyond debate.' In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Nelson* at *12 (quoting *White v. Pauly*, 137 S.Ct. 551 (internal citations omitted)). "Such specificity is especially important in the Fourth Amendment context, where the court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S.Ct. at 308 (alteration in original)(quoting *Saucier*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). *See also Kisela v. Hughes*, __ U.S. __, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018)(*per curiam*)(same).

> Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is lawful.

*Kisela*, 138 S.Ct. at 1153 (quoting *Mullenix*, 136 S.Ct. at 309, 312).

A plaintiff may show that constitutional right is clearly established in three ways: "First, the plaintiff[] may show that a materially similar case has already been decided. Second, the plaintiff[] can point to broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Terrell v. Smith*, 668 F.3d 1244,

1255 (11th Cir. 2012). "When determining whether a particular plaintiff's rights were clearly established, this [c]ourt looks only to binding precedent – cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state in which the claim arose – to determine whether the right in question was clearly established at the time of the violation." *Gregory* at 868-869 (citing *Coffin* at 1013). "In doing so, [the court] look[s] only at the state of the law on the date of the challenged conduct." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

In his response to the defendant's motion to dismiss the first amended complaint, plaintiff is not explicit about the pathway(s) he is taking to demonstrate that the officers violated a clearly established right. Though it is not entirely clear, plaintiff appears to rely on two theories – (1) that there is a broad, clearly established principle that should control the novel facts in this situation, and (2) that there are materially similar cases. With regard to the first theory, plaintiff appears to argue that the Eleventh Circuit's holding in *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011) is evidence of the broad, clearly established principle that "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *See* doc. 30 at 16-17. While the court acknowledges the existence of this line of cases and is bound by its precedent, this general principle does not apply to the facts at hand. This is not a case that can accurately be characterized as one involving a "non-hostile and non-violent suspect." While the court accepts plaintiff's version of events as true, and has assumed that he did not advance toward the officers or point his gun in their

direction, plaintiff ignores the most important facts he has offered in this case – that he answered the door to his home with a *gun in his hand* and then turned to retreat.

As to the second theory – that there are materially similar cases – plaintiff offers several. However, only one constitutes controlling precedent for qualified immunity purposes[25] – that is, *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) – and it does not "squarely govern" the constitutional issue in this case. Because plaintiff relies on this case so heavily, the court will set out the portion of the court's factual summary that was relevant to the excessive force claim:[26]

> In 2002, Mercado and his wife, Ibis, had a heated argument, during which Ibis told Mercado that she wanted to end their marriage and return to Puerto Rico without him. Mercado became despondent, began to cry, and tried to convince her to stay, telling her that he would commit suicide if she left him. To demonstrate his intent, he wrapped a telephone cord around his neck and attached the other end to a ceiling vent. Mercado used a kitchen knife to make multiple cuts on his arms. He then grasped the knife with both hands and pointed it toward his heart.
>
> Ibis called the Orlando Police Department and reported the attempted suicide, and officers were dispatched to her apartment. Rouse and Padilla were among those officers who arrived at Mercado's residence. Ibis told the officers that Mercado was armed with a knife and had threatened to commit

---

[25] Cases from other circuits, unpublished Eleventh Circuit decisions, district court decisions, and cases decided after the events in question are not "controlling precedent" for qualified immunity purposes. *See Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1221 (M.D. Ala. 2012)("A plaintiff can meet this burden in the Eleventh Circuit by pointing to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state. *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n. 10 (11th Cir.2001) (en banc)[abrogated on other grounds by *Twombly*, 550 U.S. at 544)]. The Court will not, however, look to district court decisions or rulings from the other circuit courts of appeal, because [e]ach jurisdiction has its own body of law, and splits between jurisdictions on matters of law are not uncommon. Put simply, the Eleventh Circuit does "not expect public officials to sort out the law of every jurisdiction in the country.")(internal quotations and citations omitted).

[26] Omitted from this quote are the factual allegations that related to the plaintiff's claims against the City of Orlando, as well as recitations of procedural history in that case.

suicide. The police attempted to make verbal contact with Mercado for twenty minutes from outside the apartment door. When this attempt was unsuccessful, the officers entered the apartment with Ibis's permission.

Inside, the officers found Mercado sitting on the kitchen floor, crying. He was holding the knife in both hands and pointing it toward his heart. The telephone cord was still wrapped around his neck, but there is no evidence that it was still wrapped around the ceiling vent. The officers identified themselves and ordered Mercado to drop his knife at least two times (once in English and once in Spanish), but he refused without making any threatening moves toward the officers. At no time did the officers warn Mercado that force would be used if he did not drop his weapon.

Fifteen to thirty seconds after giving that order, Padilla followed Rouse's orders to hit Mercado with the Sage SL6 Launcher ("Sage Launcher") and subdue him. The Sage Launcher is a "less lethal" munition that fires a polyurethane baton that is 1.5 inches wide, travels approximately 240 feet per second, and delivers a force of 154 foot/pounds of energy--approximately the energy of a professionally-thrown baseball. The Sage Launcher was designed to be used to protect persons from self-inflicted injury, especially when using a night stick or baton would be unsafe or impractical. The projectile is not designed to penetrate the body, but only to leave bruises.

From a distance of approximately six feet, Padilla had a clear view and fired the Sage Launcher twice, hitting Mercado once in the head. Padilla claims that he was aiming at Mercado's shoulder. The impact fractured Mercado's skull, resulting in brain injuries. He now takes medication to prevent seizures, and he suffers from a host of ailments including headaches, loss of memory, loss of balance, insomnia, dizziness, stuttering, loss of sensation and movement, loss of strength, and sensitivity to light. He is disabled and cannot work.

*Id*. at 1154–55. Based on these facts, the *Mercado* court held that the decedent was no threat to the police, and only to himself; that he was not resisting arrest and arguably did not have time to obey the officer's order to drop the knife; and that, "[b]ecause he was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the

time he was shot in the head, if [the officer] aimed for [the decedent's] head, he used excessive force when apprehending [him]." *Id.* at 1157-58.

The facts of the *Mercado* case are neither exactly, or even closely, like those of the current case. The court is simply not persuaded that this is a "materially similar case" that would have placed the constitutional question at issue in this case – that is, whether an officer who is responding to a domestic disturbance is prohibited from using deadly force against a homeowner who answers the door holding a gun and then turns to retreat into the home – beyond debate. The dissimilarities are many, but a few are worth mentioning. First, the officers who responded in the *Mercado* case knew that they were responding to a suicide call, meaning that an individual was threatening to harm himself, not others. Here, the officers were responding to a domestic disturbance, which necessarily implies the existence of conflict. Second, the decedent in *Mercado* remained seated throughout the encounter, whereas plaintiff stood in his doorway with the gun and then turned to retreat. Finally, decedent in the *Mercado* case only pointed the knife at himself. While the court accepts as true plaintiff's allegation that he did not point his gun at the officers or step toward them, that is different from pointing a weapon at one's self. The latter certainly poses less of a threat to others; the intent is to harm only one's self.

In short, the court cannot say that the *Mercado* case is factually similar enough to warrant the conclusion that its holding would have placed any reasonable officer in Arias' and Partridge's position on notice that they could not shoot plaintiff. The conduct of the officers in this case was not as extreme and disproportionate as the conduct by the officers in the *Mercado* case. Because plaintiff has failed to meet his burden of establishing that

defendants violated his clearly established right to be free from excessive force, Arias and Partridge are entitled to qualified immunity. This claim is due to be dismissed.

While the qualified immunity inquiry may end here, the court adds that *Young v. Borders*, 2014 WL 11444072, discussed *supra*, again bolsters its conclusion that plaintiff's right not to be shot by officers under these circumstances was not clearly established. In that case, the court not only determined the officers had not violated the rights of an innocent person when they shot him after he answered the door at night with a gun pointing down, and then turned to retreat into his apartment, but also concluded that the officers had not violated a clearly established right as of the date in question – July 15, 2012 – seven months prior to date at issue in this case. As noted above, the Eleventh Circuit affirmed the court's decision, finding "no reversible error in the court's ultimate qualified immunity rulings," *see Young*, 620 F. App'x. at 890, and later denied a motion for a rehearing *en banc*, *see Young*, 850 F.3d 1274.[27] In a concurring opinion, which is not binding, but nonetheless persuasive, Judges Hull and Tjoflat wrote as follows:

> In *White*, the Supreme Court reiterated "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' " *Id.* at ——, 137 S.Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011)). The Supreme Court explained that federal courts that relied on Graham, Garner, and their circuit court progeny, instead of identifying a prior case with similar circumstances, have "misunderstood" the "clearly established" analysis because those excessive force cases do not create clearly established law outside of an "obvious case":
>
> > The panel majority misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting

---

[27]  This case was before Circuit Judges Tjoflat and Hull, and Hon. J. Randall Hall, United States District Judge for the Southern District of Georgia.

under similar circumstances as Officer White was held to have violated the Fourth Amendment. Instead, the majority relied on *Graham, Garner*, and their Court of Appeals progeny, which—as noted above—lay out excessive-force principles at only a general level. Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), but "in the light of pre-existing law the unlawfulness must be apparent," *Anderson v. Creighton*, supra, at 640. For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside "an obvious case." *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam); *see also Plumhoff v. Rickard*, 572 U.S. –––, –––– [134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056] (2014) [ ] (emphasizing that *Garner* and *Graham* "are 'cast at a high level of generality' ").

*Id.* Like *White*, "[t]his is not a case where it is obvious that there was a violation of clearly established law under *Garner* and *Graham*" because "this case presents a unique set of facts and circumstances," which is "an important indication" that Deputy Sylvester's "conduct did not violate a 'clearly established' right." *Id*. With the help of hindsight, the dissents impermissibly second-guess Sylvester's split-second decision to use deadly force. The dissents define clearly established federal law at too high a level of generality, in contravention of the Supreme Court's precedent requiring a case with particularized and similar factual circumstances in order to create "clearly established" federal law.

As the Supreme Court explained decades ago, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). For that reason, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix*, 57 U.S. at ––––, 136 S.Ct. at 308 (emphasis added) (quoting *Reichle v. Howards*, 566 U.S. 658, ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)); *see also Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012).

The Supreme Court has also explained: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 57 U.S. at ––––, 136 S.Ct. at 308 (quotation marks omitted). Although identical facts are not required,

there still must be particularized facts that made clear to Deputy Sylvester that his force action was unlawful. "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect [ing] all but the plainly incompetent or those who knowingly violate the law.' " *Sheehan*, 575 U.S. at ——, 135 S.Ct. at 1774 (quoting *Ashcroft*, 563 U.S. at 743, 131 S.Ct. at 2085).

Again, qualified immunity may be denied only when the officers have "fair and clear warning of what the Constitution requires." *Sheehan*, 575 U.S. at ——, 135 S.Ct. at 1778. Even before White, this Court recognized that this "critical inquiry" about "fair warning" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (*en banc*) (quotation marks omitted). "Such specificity is especially important in the Fourth Amendment context, where ... it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 57 U.S. at ——, 136 S.Ct. at 308 (alteration accepted) (quotation marks omitted).

[…]

Here, the panel was required to find "no reversible error" because there is no prior case with facts remotely similar, much less particularized facts similar, to the facts in this case. More importantly, even the contours of the law in this type of unusual factual situation were not sufficiently clear such that a reasonable officer, in Defendant Sylvester's situation, would understand that what he is doing violates clearly established federal law.

*Young*, 850 F.3d at 1280-1282. The court then proceeded to explain why the cases upon

which the dissent relied were inapposite. While these are not the cases upon which plaintiff

relies in this case, they are worth consideration.

In its clearly established analysis, the dissent relies on our decisions in *Lundgren v. McDaniel*, 814 F.2d 600, 602 (11th Cir. 1987) and *Menuel v. City of Atlanta*, 25 F.3d 990 (11th Cir. 1994). The dissent claims that these two cases establish a "straightforward line" that police cannot shoot people merely because they have a gun in their own home. Martin, J. dissenting at 1294. Of course, that ignores the critical events that led Deputy Sylvester to the door of Apartment 114 and what happened when the door opened. The dissent also says that *Lundgren* and *Menuel* involved "circumstances closely

resembling this case." *Id.* at 1292. This is inaccurate because those cases have materially different facts.

In *Lundgren*, law enforcement officers walked by a store and saw a broken window. Suspecting a burglary, they entered the store without announcing themselves. 814 F.2d at 602. In *Lundgren*, unlike this case, there was no advance report that a burglary suspect in the store might have a gun, much less an advance report of a speeding motorcyclist involved in an assault and battery with a loaded firearm. *Id.* Upon entry, the officers in Lundgren instantaneously shot the storeowner who, after hearing the officers in his store, rose up from behind his desk where he had been sleeping. *Id.*

In *Lundgren*, there was even conflicting testimony about whether the storeowner had a gun. The officers testified that they saw a man with a pistol in his hands. The storeowner's wife, who was with him, gave conflicting testimony about whether or not the storeowner had reached for his gun but said that the storeowner "never really had a chance to get up off the floor." Id. Indeed, the forensic evidence showed that the bullet that struck the storeowner in the head had first passed through the desk. *Id.*

This Court reviewed that conflicting evidence from the Lundgren trial and concluded that, based on the evidence, the "jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect." *Id.* at 603. We thus held that shooting a non-threatening suspect was an unreasonable seizure that was clearly established, and we denied qualified immunity. *Id.*

No jury is needed here to decide if a storeowner reached for a gun or not. It is undisputed Mr. Scott held a gun when he opened the door and was in full view of Deputy Sylvester. The officers here knocked on the door first and did not enter into a store unannounced. The officers also had reason to think that the motorcyclist may be inside Apartment 114 and may be armed and dangerous. This reasonable suspicion was seemingly verified when Mr. Scott opened the door with a gun in his hand and began moving in a manner reasonably perceived as an attempt to take cover to fire. If anything, *Lundgren* is inapposite here.

The dissent's second case is *Menuel*, where officers shot a girl after she fired at them. 25 F.3d at 993. Given that the girl shot first, this Court concluded that the officers' actions were objectively reasonable and that no Fourth Amendment violation occurred. Id. at 997. While the *Menuel* officers took fire before shooting, nothing in *Menuel* states, much less holds, that

officers must wait to be fired upon before using deadly force. *Menuel* provides little guidance on whether an officer may reasonably believe the use of deadly force is justified when the person reportedly has been in a prior armed altercation, has a gun, and moves as if to take cover to fire.

Taken together, what these two prior cases (cited by the dissent) do illustrate is the wide variety of difficult and complex facts in excessive force cases. These two cases, however, do not closely, or even similarly, resemble the facts of this case, which means qualified immunity protects Deputy Sylvester. *See Mullenix*, 57 U.S. at ——, 136 S.Ct. at 312 ("Even accepting that these circumstances fall somewhere between the two sets of cases ... qualified immunity protects actions in the 'hazy border between excessive and acceptable force.' ") (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004)). Nor do these two cases put Sylvester on "fair notice" that the use of deadly force in this factual situation violated the Fourth Amendment. This is a difficult and unique case that is not answered by either our precedent or Supreme Court precedent. To find Sylvester's use of force objectively unreasonable, that conclusion must "follow immediately" from the principles of our past precedents. *Mullenix*, 57 U.S. at ——, 136 S.Ct. at 309. That is not the case here.

The panel's unpublished, non-precedential affirmance of the district court's qualified immunity ruling is not incongruous with this Circuit's precedent in excessive force cases. En banc consideration is thus not necessary to "maintain uniformity of the court's decisions" under Federal Rule of Appellate Procedure 35. Fed. R. App. P. 35(a)(1).

*Young*, 850 F.3d at 1282–84 (footnotes omitted).

Although the court is not required to do so, it has considered the *Manuel* and *Lundgren* cases and likewise concludes that neither clearly established that the officers' conduct in this case was unconstitutional. The court is unaware of any other controlling precedent that would dictate a contrary. Thus, because plaintiff has failed to meet his burden to demonstrate the violation of a clearly established law, Arias and Partridge are entitled to qualified immunity on the excessive force claim.

### iii. Second Amendment violation

Plaintiff alleges that Arias and Partridge shot him "for lawfully exercising his Second Amendment right to possess a firearm for his own protection in his own home." *See* doc. 51 at 29. Defendants argue that the Second Amendment does not provide a basis on which to challenge a police officer's use of force. *See* doc. 55 at 23. The defendants also again raise a qualified immunity defense. *See id.*

Plaintiff's claim is novel, and the court has been unable to find a case directly on point within the Eleventh Circuit. However – in the wake of *D.C. v. Heller*, 554 U.S. 570 (2008), in which the Supreme Court struck down a statute banning possession of a handgun in one's home, and held that "the Second Amendment elevates above all interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), in which the Supreme Court applied *Heller* to state and local governments and held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" – other courts have been presented with claims similar to plaintiff's.

The court finds persuasive the holdings in *Schaefer v. Whitted*, 121 F. Supp. 3d 701 (W.D. Tex. 2015) and *Heyward v. Tyner*, 2017 WL 9673667 (D.S.C. Nov. 29, 2017). In *Schaefer*, a plaintiff challenged an officer's attempt to disarm him while he was on his property conducting an investigation. The court rejected what it characterized as an excessive force claim recast as a Second Amendment claim, and reasoned, *inter alia*, as follows:

> Plaintiff has presented no authority suggesting a mere attempt to seize
> an individual's weapon constitutes an independent violation of the Second
> Amendment, nor has he directed the Court to any Fifth Circuit precedent

supporting a theory Officer Whitted's assault violates Schaefer's constitutional rights merely because it was perpetrated while Schaefer lawfully possessed a firearm on his own property. While the Court agrees with Plaintiff's characterization of the right enshrined in *Heller* and *McDonald,* it does not agree they stand for the creation of a cause of action against Officer Whitted under the Second Amendment in these circumstances. Indeed, *Heller* and *McDonald* involved challenges to local ordinances effectively placing blanket bans on the possession of certain firearms. Here, Plaintiff does not challenge a city ordinance uniformly depriving him of his right to lawfully brandish a weapon at his residence but instead challenges an individual city officer's unique conduct during a domestic disturbance investigation. *Heller* and *McDonald* offer little guidance in this context where the circumstances pit an individual's Second Amendment rights to carry a weapon for self-defense at his or her residence against an officer's rights to safely conduct the investigation of a crime at such an individual's home. This delicate balance has been properly struck under the Fourth Amendment, which seeks to determine the objective reasonableness of a particular search or seizure. *See, e.g., Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Absent authority to do so, the Court declines to transform an excessive force claim into a novel Second Amendment claim merely because the challenged conduct has been recast as an attempt to seize Schaeffer's weapon while he was physically on his property. Accordingly, Plaintiff fails to state a claim under the Second Amendment.

*Id.* at 710–11. In *Heyward*, the plaintiff argued that an officer violated the decedent's Second Amendment rights when he shot him because he had a firearm. The court adopted the *Schaefer* court's reasoning and dismissed the claim. It explained:

This court agrees with the *Schaefer* court. The Plaintiff in the case at bar was lawfully armed in defense of his home. The Plaintiff has stated a cognizable excessive force claim for the violation of his Fourth Amendment rights. … Absent any authority, this court recommends that the district court decline to "transform an excessive force claim into a novel Second Amendment claim" because the officer's conduct has been recast as being caused by the Plaintiff's exercise of his right to bear arms. This court recommends that the Motion to Dismiss be granted as to the eighth cause of action.

*Id.* at *7. Also persuasive is the holding in *Spry v. West Virginia*, 2017 WL 440733 (S.D.

W.Va. Feb. 1, 2017), which is more factually similar to the case at bar. In that case, the

court reasoned:

> The present case does not involve direct interference with Second Amendment rights. *Rather, Plaintiffs' Second Amendment claim rests on the police shooting itself. Plaintiffs allege that Trooper Belt violated the decedent's Second Amendment rights when Trooper Belt entered the home and shot the decedent,* ostensibly because he aimed a weapon in Trooper Belt's direction. Plaintiffs do not cite a single case as authority for the proposition that the individual right to bear arms trumps a law enforcement officer's right of self-preservation. They seem to invoke the Second Amendment as an additional, alternative means of challenging what they believe to be an unreasonable use of force on the part of Trooper Belt. That use of force is properly subject to challenge under the Fourth Amendment's excessive force clause, not the Second Amendment. *See Andrews v. Flaiz*, No. 1:14 cv 623, 2014 WL 4925044, at *9 (N.D. Ohio Sept. 30, 2014) (finding that the Fourth Amendment, rather than the Second Amendment, provides the appropriate vehicle to challenge the seizure of weapons pursuant to a law enforcement search).

*Id.* at *7 (emphasis added).

This court follows suit. Plaintiff has not alleged that officers acted

unconstitutionally by confiscating his firearm or otherwise infringing on his right to own a

gun or possess it on his property. At its core, plaintiff's claim is simply an excessive force

claim, which the court has already addressed. Absent any authority to the contrary, the

undersigned declines to convert an excessive force claim into a separate Second

Amendment claim simply because plaintiff alleges that he was shot for having a gun on his

property.

Alternatively, the claim is due to be dismissed because plaintiff has failed to meet

his burden to overcome qualified immunity. It is undisputed that the officers were acting

within their discretionary authority; therefore, plaintiff must demonstrate that they violated a clearly established right. Even assuming he has alleged a constitutional violation, plaintiff has made no attempt to demonstrate that the right – as he characterizes it – was clearly established on the date in question. Plaintiff's failure to present any controlling precedent establishing that a police officer is liable under the Second Amendment for shooting him because he was holding a gun is fatal. The officers are entitled to qualified immunity and this claim is due to be dismissed.

### iv.      Fourth Amendment malicious prosecution

Plaintiff brings a § 1983 malicious prosecution claim against Arias, Partridge, and "supervisory defendants." This claim stems from plaintiff's arrest on two charges of menacing. Plaintiff was jailed until he was released on bond. He was initially convicted. He appealed that conviction and was eventually acquitted.

Plaintiff alleges that his arrest on two charges of menacing was "the result of Arias and Partridge supplying false information to their supervisors and to state investigators and prosecutors." *See* doc. 51 at 21. According to plaintiff, Arias and Partridge were the "complaining witnesses who provided false information and allegations against [him]." *See id.* at 30. Plaintiff further alleges that "Arias and Partridge, together with one or more of the Supervisory Defendants, provided false oral and/or written reports in support of the charges against plaintiff and failed to provide the prosecutor's office assigned to this case with exculpatory information." *See id.* Finally, plaintiff alleges that the defendants conspired and agreed to pursue the wrongful prosecution of plaintiff as a defense to

plaintiff's civil suit," *see id*., and that his "continuing criminal prosecution was a natural consequence of the [i]ndividual and [s]upervisory defendants' conduct." *See id.*

Defendants move to dismiss on several bases. The first relates to the probable cause element of the claim. Defendants argue that they are entitled to qualified immunity because (1) "plaintiff's initial convictions constitute *prima facie* evidence of probable cause for [p]laintiff's arrest on all charges[,]" and (2) generally, under the totality of the circumstances, the officers had arguable probable cause to arrest him for menacing, and (3) the officers had "arguable probable cause to arrest [p]laintiff for possession of marijuana and for unlawful possession of drug paraphernalia." *See* doc. 55 at 25-27. The second basis for dismissal raised by defendants relates to the "institution" element of the claim. Specifically, defendants argue that none of the defendants instituted the criminal prosecution against the plaintiff and, thus, they cannot be held liable for malicious prosecution and are entitled to qualified immunity. *See id.* at 28. Finally, the defendants argue that, to the extent plaintiff brings this claim against "supervisory defendants," "non-specific allegations about the roles of "supervisory defendants" cannot overcome the qualified immunity defense." *See id.* at 27.

Before reaching the merits of these arguments, the court must address the defendants against whom this claim is stated. While it is not entirely clear, it seems that plaintiff intends to state this claim against Arias, Partridge, and so-called "supervisory defendants." However, in the facts section of the second amended complaint, where plaintiff has a section entitled "Events of the [m]alicious [p]rosecution," he alleges no facts relating to actions or omissions of these so-called "supervisory defendants." Rather, plaintiff only

discusses the actions of Arias and Partridge. That is, he alleges that "the arrest and criminal charges were the result of *Arias and Partridge['s* supplying false information to their supervisors and to state investigators and prosecutors." *See* doc. 51 at 21. Plaintiff also alleges, "Based on *Partridge and Arias's* false allegations, arrest and charges that claimed [p]laintiff threatened them with serious harm with a gun, the State of Alabama prosecuted [him] … ." *See id.* at 22. In the actual count, he states that "Partridge and Arias … maliciously prosecuted plaintiff" and that his damages were "a proximate result of Arias['] and Partridge's malicious prosecution." *See* doc. 51 at 29-30. However, sandwiched between these two statements are references to "supervisory defendants." Plaintiff states: "The Defendants Arias and Partridge, *together with one or more of the supervisory defendants*, provided false oral and/or written reports in support of the charges against plaintiff and failed to provide the prosecutor's office assigned to this case with exculpatory information[,]" "Plaintiff's continuing criminal prosecution was a natural consequence of Individual and *Supervisory Defendants'* conduct, and Plaintiff incurred damages for legal fees, loss of liberty, and embarrassment and humiliation as a proximate result of Arias['] and Partridge's malicious prosecution." *See id.* at 30. Therefore, the court assumes that plaintiff intends to bring the claim against "supervisory defendants," as well as Partridge and Arias.

However, plaintiff never explains who these supervisory defendants are. It is possible that they are Anderson, Hurley, Hauser and Jones, as each of these is described in the "parties" section of the "facts" section of the second amended complaint as a "supervisory" personnel member; Anderson, Hurley, and Hauser are described as

"supervisory shift commander[s]," and Jones is said to be "the supervisory [c]hief of [p]olice" for the Enterprise Police Department. *See* doc. 51 at 3. However, the court cannot know this for certain. Plaintiff's response to the motion to dismiss provides no instruction. As the court has explained previously, plaintiff's response focuses only on the evidence defendants cite and fails to address any of the actual arguments in their motion to dismiss. *See* doc. 59. While the sur-reply seeks to cure this omission by incorporating by reference plaintiff's response to the first amended complaint, *see* doc. 68, plaintiff fails to explain in the incorporated response who these defendants are – and fails to counter defendants' arguments about why the malicious prosecution claim against them should be dismissed. As best the court can tell, this is likely because, in the first amended complaint, the federal malicious prosecution claim was only stated against Arias and Partridge – not against the "supervisory defendants," whomever they may be. *See* doc. 18 at 44-45.[28] Thus, plaintiff has neither explained who these defendants are *nor* responded to motion to dismiss the claims against them.

Even if the court were to assume that plaintiff is referring to Anderson, Hurley, and Hauser, plaintiff only mentions their names in the "parties" section of the complaint within 26 pages of factual allegations. To be clear, he never attributes *any* action or omission giving rise to the malicious prosecution (or any other claim, for that matter) to any of these three individuals. Thus, to the extent plaintiff intended his references in the malicious prosecution count to "supervisory defendants" to be references to Anderson, Hurley, and

---

[28]   This is yet another example of the dangers of incorporating responses to motions to dismiss a now obsolete version of the complaint.

Hauser, and intended to allege that they maliciously prosecuted him, this claim – at least at to these defendants – is due to be dismissed. *See Roddy v. City of Sheffield, Ala.*, 2012 WL 5427907, *6 (N.D. Ala. Nov. 5, 2012)(holding, because plaintiff failed to allege with any particularity the acts or omissions of a defendant – and had only referred to unspecified groups of defendants, of which he may or may not have been a part – that plaintiff had not stated any federal claims against that defendant and dismissing the claims against him); *Ross v. Alabama,* 893 F. Supp. 1545 (M.D. Ala. 1995)(holding that the plaintiffs' allegations were "so obscure and incomplete as to fail even under notice pleading" because the plaintiffs "generically lump[ed] Parsons together with all other parties as 'defendants[,]'" and "fail[ed] to aver even one act of Parsons that allegedly deprived them of their constitutional rights"; and because, "from reading the complaint, the court ha[d] no idea what the basis of liability [was] as to Parsons.").

This claim against the supervisory defendants is also due to be dismissed for plaintiff's failure to respond to the defendants' motion to dismiss as to this claim. *See, e.g., Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326 (failure to brief and argue an issue before the district court is grounds for declaring it abandoned); *Black*, 461 F.3d at 588 n.1 (plaintiff abandoned claim by failing to defend it in response to a motion to dismiss); *Kirkland*, 2009 WL 596538 at *2 (granting motion to dismiss where plaintiff had not filed a brief in opposition).[29]

---

[29]   In light of the above, the court need not reach "the supervisory defendants'" assertion of qualified immunity.

As to this claim as it relates to Arias and Partridge, a section 1983 claim for malicious prosecution arises under the Fourth Amendment. *See Grider,* 618 F.3d at 1256. In *Grider,* the Eleventh Circuit set forth the claim's elements:

> To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. As to the first prong, the constituent elements of the common law tort of malicious prosecution are: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.

*Id.* (internal citations and emphasis omitted). Therefore, the court must first determine whether plaintiff's allegations plausibly establish that he meets the common law elements of the claim and then analyze whether he has alleged an unreasonable seizure.

### a.   Common law elements of malicious prosecution

Defendants do not contest the third and fourth common law elements – (3) that the prosecution "terminated in plaintiff's favor" and (4) "caused damage to the plaintiff accused"; therefore, the court assumes these elements are met. The complaint supports this assumption. Defendants, however, argue that plaintiff has failed to plead facts establishing the first and second elements – (1) "a criminal prosecution instituted or continued by the present defendant" and (2) "with malice and without probable cause." Defendants maintain that because plaintiff cannot meet these elements, he cannot establish a constitutional violation. Therefore, they assert they are entitled to qualified immunity.

### i.   "[A] criminal prosecution instituted or continued by the present defendant"

In their motion to dismiss, defendants argue that because neither officer filed any charges against plaintiff, they cannot, as a matter of law, have instituted or continued the prosecution. *See* doc. 55 at 28. In his response, plaintiff counters that if one brings about the prosecution by fraud, he or she is the institutor of the judicial proceeding against a malicious prosecution plaintiff, even if he or she did not sign the warrant or complaint in support of it. *See* doc. 30 at 30-31. In their response to plaintiff's sur-reply, defendants argue that plaintiff has failed to show that it was clearly established that an officer who gives false statements to an investigating officer, but does not sign the warrant complaint, instituted or continued the prosecution. The court is not persuaded by defendants' argument.

Plaintiff directs the court to Alabama law that supports his position that Arias and Partridge instituted his prosecution. Under Alabama law, "[i]t is axiomatic that there can be no cause of action for malicious prosecution unless the evidence shows that the judicial proceeding was instigated by the defendant." *Alabama Power Co. v. Neighbors*, 402 So.2d 958, 962 (Ala. 1981). Alabama courts have held for nearly a century that, "if a defendant merely gives the district attorney's office information regarding an alleged crime, leaving the decision to prosecute entirely to the uncontrolled discretion of the district attorney, who thereafter makes his own independent investigation and thereupon takes the information before the grand jury which returns indictments against the suspects, the defendant, in a malicious prosecution action, is not regarded as having instigated the criminal proceeding." *Id.* at 962.  Similarly well-established is the long-standing tenet that "giving information of a crime to officers, or a request that the officers investigate a crime is not aiding or

abetting or instigating a prosecution, *unless* such information was a misrepresentation of the facts in order to induce action, or there was a suppression of known material facts." *Id.* at 964 (emphasis added)(quoting *Dismukes v. Trivers Clothing Co.*, 221 Ala. 29, 32 (Ala. 1930)(citing *American Surety Co. v. Pryor*, 211 Ala. 114 (Ala. 1924)). Thus, "if one 'corruptly or oppressively brings about the indictment or prosecution of another maliciously and without probable cause … by [method of] fraud, perjury, subornation, or by the willful suppression of known material facts, the intentional thwarting of a fair investigation," he is "no less guilty than if he had sworn out a warrant in the first place," and is the instigator of the judicial proceeding against the plaintiff. *Id.* at 965.

In this case, plaintiff alleges that Arias and Partridge lied when they stated that plaintiff pointed his gun at them, and that they did so to escape civil liability. Plaintiff claims that the officers were the "complaining witnesses," and they relayed this version of events to their supervisors, state investigators, and prosecutors. Taking plaintiff's allegations as true, under Alabama law, the officers instituted the prosecution. This is so for two reasons. First, although they are law enforcement officers, in this instance, they were the victims of the alleged crime, to which there were no other witnesses. Thus, without their relaying to their supervisors or investigators or prosecutors that plaintiff had pointed his gun at them, there would have been no basis for bringing the prosecution against him. The officers are *the* sole source of the alleged facts which gave rise to the charge. Second, according to complaint, the officers *lied* about the very actions of plaintiff that formed the basis of the charge. Moreover, according to plaintiff, they did so in order to escape civil liability; put another way, they lied "in order to induce action" against plaintiff. *See*

*Neighbors* at 964. Finally, plaintiff alleges that Arias and Partridge were the "complaining witnesses," and they are listed as the "government's witnesses" on the complaints of which the defendants ask the court to take judicial notice; thus, the court can readily deduce that the complaining officer and prosecution relied on their version of events in applying for the warrant and prosecuting the plaintiff. When these facts are combined, it is clear that, at least under Alabama law, Arias and Partridge were the instigators of the judicial proceeding against plaintiff. *See Neighbors* at 962-965 (giving information of a crime to officers, or a requesting that the officers investigate a crime is not instigating a prosecution, unless such information was a misrepresentation of the facts in order to induce action, or there was a suppression of known material facts).

The Eleventh Circuit has long held that, "[a]lthough ultimately federal law governs the elements of a § 1983 malicious prosecution claim, state law can 'help inform the elements of the common law tort of malicious prosecution.'" *Williams v. City of Abbeville*, 2013 WL 1117297, *4 (M.D. Ala.) (quoting *Grider*, 618 F.3d at 1256). *See also Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003)("As to the constituent elements of the common law tort of malicious prosecution, this Court has looked to both federal and state law and determined how those elements have historically developed."). However, in a decision from August of this year, the Court reiterated that federal – not state – law dictates the outcome of a malicious prosecution claim. In *Blue v. Lopez,* __ F.3d __, 2018 WL 4088457, *5 (11th Cir. Aug. 28, 2018), the trial court relied on Georgia state law in determining whether plaintiff had met the probable cause element of the common law claim. The Eleventh Circuit held that this was error, explaining as follows:

[Plaintiff] argues that the district court erred in applying [Georgia law that allows denial of a motion for directed verdict to serve as conclusive evidence of probable cause] to grant summary judgment for Lopez. We agree.

Federal law, not state law, governs the resolution of § 1983 claims. And federal law does not allow the denial of a motion for directed verdict to serve as conclusive evidence of probable cause.

As we have previously noted, "a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Wood,* 323 F.3d at 882. So although "courts historically have looked to the common law for guidance as to the constituent elements of the claim," *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir.1998), "[w]hen malicious prosecution is brought as a federal constitutional tort, the outcome of the case does not hinge on state law, but federal law, and does not differ depending on the tort law of a particular state." *Wood*, 323 F.3d at 882 n.17. Indeed, with respect to the very issue we consider here, we have cited with approval the Second Circuit's statement that the "federal law of probable cause—not state law—should determine whether a plaintiff has raised a genuine issue of material fact with respect to a § 1983 malicious prosecution claim." *Id.* (quoting *Green v. Montgomery,* 219 F.3d 52, 60 n.2 (2d Cir.2000) ).

If the rule were otherwise, the same malicious-prosecution claim brought as a federal constitutional tort would result in different outcomes depending on the state in which it was prosecuted. But a § 1983 malicious-prosecution claim is a *federal* constitutional tort. It is therefore governed by federal law, so it will produce the same outcome, regardless of the state in which it is brought. Since our decision in *Wood*, we have reiterated this principle in other published cases. *See, e.g., Kjellsen*, 517 F.3d at 1237; *Grider v. City of Auburn,* 618 F.3d 1240, 1256 (11th Cir.2010).

Here, however, the district court relied on state law instead of federal law to resolve Blue's malicious-prosecution claim. And in this case, the state law the district court relied upon … yields a resolution that federal law does not allow.

*Id.* at *5 (emphasis in original). Thus, it is unclear whether Alabama cases interpreting Alabama law alone can dictate whether or not defendants "instituted or continued the prosecution" for purposes of plaintiff's federal malicious prosecution claim. If they do,

plaintiff has certainly met is burden; if they do not, the claim still survives because there is ample support in Eleventh Circuit case law for his position.

While the Eleventh Circuit is clear that police officers are not the legal cause of an original proceeding where there is no evidence that they had anything to do with the decision to prosecute, the Circuit has carved out an exception if the officers "improperly influenced" the prosecutor's decision by "deception." In *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir. 1994), the court was presented with officers who "fully appris[ed] the [prosecutor] of all relevant information known to them, including that which weighed for and against [plaintiff's guilt]," and who, relying on a reasonable tip, arrested the plaintiff and then "turned over all relevant information about the matter to the [prosecutor.]" The court held that because the officers had "nothing to do with the decision whether or not to prosecute [plaintiff] and "did [not] act in such a way as to improperly influence the decision by the [prosecutor]," plaintiff had failed to state a claim for malicious prosecution against them. Similarly, in *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989), the court explained, in the context of a false arrest claim, that "[t]he intervening acts of the prosecutor, grand jury, judge and jury – assuming that these court officials acted without malice that caused them to abuse their powers – each break the chain of causation *unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policemen*." *Id*. (emphasis added). Thus, it is established in this Circuit that an officer can be held liable for initiating a prosecution if he "improperly influenced" the prosecution by deception.

The Eleventh Circuit has applied the *Barts* and *Eubanks* principles together and found that an officer who fabricated evidence was a proper target of a malicious prosecution claim. In *Williams v. Miami-Dade Police Dept.*, 297 F. App'x 941, *5-6 (11th Cir. 2008), the plaintiff alleged that an officer fabricated evidence which led to his arrest and prosecution. Specifically, plaintiff claimed that the officer falsified evidence that other officers and the prosecutor relied on. *See id.* at 5. While the defendant officer argued he could not be held liable for malicious prosecution because he had not been the legal cause of the proceedings against plaintiff, the court found that plaintiff "ha[d] provided evidence raising a genuine issue of material fact as to whether his arrest was the result of deception … by the defendant … ." *See id.* Moreover, the court held, it was "apparent … that the [prosecutor][had] rel[ied] on information provided by [defendant] in his prosecution of [plaintiff]." *See id.* Ultimately, citing *Barts* and *Eubanks*, the court determined that plaintiff "satisfied the common law element that [defendant] was the legal cause of his original prosecution" and that the district court had erred in holding that plaintiff had not satisfied that element of the common law claim.

Despite the existence of the above-cited case law, the defendants still urge the court to find that because the officers did not actually sign the warrant complaint, they did not institute the suit. However, the cases they rely on are inapposite. First, defendant cites *Williams v. City of Abbeville*, 2013 WL 1117297 (M.D. Ala. Mar. 18, 2013). However, contrary to defendants' suggestion, the *Williams* decision does not stand for the unequivocal proposition that if an officer does not sign a warrant complaint or affidavit, he or she cannot be held liable for malicious prosecution. In that case, just as in the cases

described above, the court held that there were no plausible facts suggesting that either of the defendant officers "had signed a sworn statement or affidavit in support of a warrant *or otherwise engaged in affirmative conduct that commenced or continued the criminal prosecution against the plaintiff.*" *Id.* at 8. Moreover, the facts in *Williams* are distinguishable. In that matter, the court found that "at best, the facts establish[ed] that [the officers] knew that [another officer] had 'coerced' a witness to 'mak[e] a false statement' that plaintiff had robbed him." *Id.* Mere knowledge that someone else engaged in some level of fraud with the goal of prosecuting another is different from a case in which the perpetrator of the fraud and originator of the false fact gives rise to the charge. *Williams* is not persuasive here.

The second case defendants cite is *Jones v. Butt*, 643 F. App'x 926, 930 (11th Cir. 2016). Defendants are correct that in that case, the Eleventh Circuit held that "making statements [even if they are knowingly false] to a detective in the context of a larger criminal investigation does not mean that individual initiated a criminal prosecution." However, the facts are, again, distinguishable from the case at bar. In *Jones*, the officer "merely conveyed information about his prior experience investigating [plaintiff] and a recent conversation with [plaintiff's girlfriend's mother]" "to a detective in the context of a larger criminal investigation." *See id.* Here, there was no pre-existing investigation that the officers weighed in on, and the statements they made did not bear on tangential issues. Rather, their misrepresentations constituted the very soil and seedbed from which the prosecution grew. *Jones* is likewise unpersuasive.

Ultimately, whether the court looks to state or federal law to understand the word "institute" in this context, the result is the same – if a defendant officer *lies* about the very fact that gives rise to the charge against a plaintiff, and is, indeed, the very source of that fact, then he or she instituted the proceedings for the purposes of a malicious prosecution claim. Based on the facts set out in the second amended complaint, plaintiff has plausibly alleged that defendants Arias and Partridge initiated the proceeding by their misrepresentations. This element has been met.

However, before proceeding to the second contested element, the court must still address whether the above law was clearly established at the time of the events giving rise to the complaint. The officers went to plaintiff's home on February 16, 2013 and he was arrested on February 21, 2013. Only decisions from the United States Supreme Court, published decisions from the Eleventh Circuit, and decisions from the Alabama Supreme Court constitute controlling authority for qualified immunity purposes. To the extent that it constitutes controlling authority, Alabama's law on the matter has been established for the better part of a century. Eleventh Circuit case law was also established at the time. Based on *Barts* and *Eubanks*, which were published Eleventh Circuit decisions issued well before the date in question, any reasonable officer deciding whether or not it was constitutional to falsify evidence in order to circumvent civil liability would have known that he or she cannot lawfully fabricate facts in order to effect an arrest and prosecution without probable cause. Any reasonable officer also would have known from these cases

that an attempt to "improperly influence" a prosecution through deception violates the Fourth Amendment.[30]

### ii.      "[W]ith malice and without probable cause"

Under Alabama law, "a person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury." *See* Ala. Code § 13A-6-23 (1975). Plaintiff alleges that his menacing charge was based on the officers' false version of the events at his home. Fabricated facts cannot provide probable cause; therefore, plaintiff has sufficiently alleged that probable cause was lacking. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1233 (11th Cir. 2004)("If defendants fabricated or unreasonably disregarded certain pieces of evidence to establish probable cause, or arguable probable cause, as alleged, reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause existed … ."); *Wal-Mart Stores v. Goodman,* 789 So.2d 166, 174 (Ala. 2000)("In malicious prosecution cases, probable cause is defined as such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty.") (internal citations omitted)). Plaintiff's allegations, taken as true, also support the conclusion that there was malice here, as malice can be inferred from the lack of

---

[30] As to defendants' argument that plaintiff fell short of meeting his burden by failing to point the court to controlling precedent – including that set out above – the court is not persuaded to recommend granting their motion on this basis. Plaintiff cited the Alabama line of cases, and referenced federal cases that place the relevant issues before the court. Thus, the court cannot conclude that plaintiff has failed to meet his burden to show a violation of a clearly established right.

probable cause. *See Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1273 (N.D. Ala. Aug. 29, 2012)(with regard to a federal malicious prosecution claim, holding that malice can be inferred from the lack of probable cause or from defendant's conduct, "where such conduct will admit of no other reasonable construction.")(internal citations omitted); *Strickland v. City of Dothan, Ala.*, 399 F. Supp. 2d 1275, 1297 (M.D. Ala. 2005)(citing *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 833 (Ala. 1999)).

In their motion to dismiss, defendants argue (1) that "plaintiff's initial convictions constitute *prima facie* evidence of probable cause for [p]laintiff's arrest on all charges[,]"; (2) generally, that under the totality of the circumstances, the officers had arguable probable cause to arrest him for menacing; and (3) that the officers had "arguable probable cause to arrest [p]laintiff for possession of marijuana and for unlawful possession of drug paraphernalia." *See* doc. 55 at 25-27. The court will address each argument in turn; however, before proceeding, it must note that defendants misstate the standard. The relevant inquiry is not whether or not the officers had probable cause to arrest the plaintiff. "[T]he probable cause relevant to a constitutional claim of malicious prosecution is not probable cause to arrest but probable cause to institute or continue the malicious prosecution." *Lawrence v. City of Fairhope*, 2010 WL 1658786, *9 (S.D. Ala. Apr. 22, 2010)(citing *Wood v. Kesler*, 323 F.3d 872, 881-82 (11th Cir. 2003)).

Turning to defendants' arguments, the first is unpersuasive. Even if Alabama's law on probable cause is controlling,[31] plaintiff's second amended complaint contains

---

[31] *See Blue,* 2018 WL 4088457 at *5 (holding that "a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are

allegations sufficient to overcome the presumption. *See Lawrence,* 2010 WL 1658786 at

*15 ("The defendants note that a conviction is prima facie evidence of probable cause, even

if the decision is later vacated. […] True enough, but this evidence may be rebutted by any

competent evidence which clearly overcomes the presumption arising from the fact of the

defendant's conviction in the first instance.).

The second and third arguments – that there was arguable probable cause in this

case – likewise fail. The "facts" that defendants point to in support of their argument that

there was arguable probable cause (*i.e.*, that defendant pointed his gun at the officers,

"hesitated to drop the gun for several seconds despite the officers' repeated orders," and

had drugs and drug paraphernalia in the home) are disputed and gleaned from extrinsic

materials that the court will not consider at this stage of the proceedings. Because

defendants' arguable probable cause arguments are utterly dependent on these facts, they

fail.[32]

Finally, it was clearly established in February 2013 that fabricated evidence cannot

form the basis of arguable probable cause. *See Kingsland*, 382 F.3d at 1233. Any

reasonable officer would have known on the date in question that wholly fabricated facts

---

met ultimately are controlled by federal law," and that "[t]he federal law of probable cause—not
state law—should determine whether a plaintiff has raised a genuine issue of material fact with
respect to a § 1983 malicious prosecution claim.")(internal citations omitted).

[32] Moreover, while defendants implore the court to consider whether arguable probable cause
existed without the allegedly false information, the court cannot determine that this was so. The
allegations of the complaint simply do not support a finding that there was arguable probable cause.
While this argument may be successful at a later point in the proceedings, it is inappropriate at this
stage and on this record.

cannot lead to a conclusion that there was probable cause to initiate a judicial proceeding. Thus, on the record before it, qualified immunity is inappropriate.[33]

Ultimately, Plaintiff's complaint contains sufficient allegations to establish plausibly the common law elements of his malicious prosecution claim. Therefore, the court must proceed to the next step – determining whether or not plaintiff has alleged a Fourth Amendment unreasonable seizure.

### b.    Fourth Amendment seizure

Defendants do not contest this element, except to the extent they argue that there existed arguable probable cause to arrest the plaintiff. As explained above, this argument is unavailing at this juncture.

Plaintiff has alleged that he was arrested on charges for which there was no probable cause and held in jail until he was released on bond. Thus, he has sufficiently alleged an unreasonable seizure. *See Garrett v. Stanton*, 2009 WL 4258135, *6 (S.D. Ala Nov. 19, 2009)(Noting that "[a] seizure under Fourth Amendment jurisprudence is generally a discrete event, quintessentially an arrest … or at least a physical detention," and holding that even though plaintiff self-surrendered after a warrant was issued and bonded out immediately thereafter, she had alleged a Fourth Amendment seizure for the purposes of a

---

[33]  As to defendants' argument that plaintiff failed to meet his burden of pointing the court to controlling precedent clearly establishing that arguable probable cause did not exist, the court is unpersuaded. Plaintiff cited non-binding federal case law, which in turn, cited binding case law. This was sufficient to place the relevant issues before the court. *See* doc. 30 at 31 (citing *Williams,* 2013 WL 1117297 at *7, for the proposition that an officer who knowingly fabricates the information he submits in support of an arrest warrant would have known that probable cause was lacking and that any subsequently obtained warrant would violate the Fourth Amendment). Thus, the court cannot say that plaintiff has failed to meet his burden to show a violation of a clearly established right.

malicious prosecution claim.)(citing *Nieves v. McSweeney*, 241 F.3d 46, 55 (1st Cir. 2001)).

Because plaintiff has sufficiently pled a Fourth Amendment malicious prosecution claim, this claim – as it is stated against Arias and Partridge – should proceed. The officers are free to reassert their entitlement to qualified immunity at a later stage.

### B.    The *Monell*[34] claim against the City, Chief Jones, and "the supervisory defendants"

Plaintiff seeks to hold the City of Enterprise, Chief Jones, and "the supervisory defendants"[35] liable for customs, policies, and practices which he alleges Arias and Partridge followed when they violated his Fourth and Second Amendment rights by unreasonably seiz[ing], shoot[ing], and injur[ing] him."[36] To the extent the claim is stated

---

[34]  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

[35]  While the title of the count – "*Monell* liability – City of Enterprise and Chief Jones" – suggests that this claim is stated only against the City and Chief Jones, plaintiff mentions the "supervisory defendants" in the body of the count. Additionally, in the preceding facts section, plaintiff inserts the title, "Events [s]upporting Monell [l]iability of City, Chief Jones, *and the Supervisory defendants*." *See* doc. 51 at 24 (emphasis supplied). Thus, the court assumes that the claim is stated against "the supervisory defendants," as well. The complaint does not, however, give any indication of who these "supervisory defendants" are. It is possible that these are Anderson, Hurley, Hauser and Jones, as each of these is listed in the "parties" section of the "facts" section of the second amended complaint as a "supervisory" personnel member. Anderson, Hurley, and Hauser are described as a "supervisory shift commander[s]," and Jones is said to be "the supervisory [c]hief of [p]olice for the Enterprise Police Department. *See* doc. 51 at 3. However, as noted previously, plaintiff never clarifies in the second amended complaint that his references to "supervisory defendants" are references to these four individuals.

[36]  The plain reading of this count is that plaintiff seeks to hold the City, Jones, and "the supervisory defendants" liable for the policies which led to his shooting and resulting injury, not the subsequent malicious prosecution. In other words, plaintiff is not seeking to hold the City, Jones, or the "supervisory defendants" liable for his malicious prosecution under a *Monell* theory.

against the City and Chief Jones, it fails. "Since there was no constitutional violation, plaintiff's claims against [the City and Chief Jones] must also fail." *Clark*, 2011 WL 13136620.

To the extent the claim is raised against the "supervisory defendants," it also fails. First, plaintiff never identifies who these "supervisory defendants" are. [37]  Second, even if the court were to assume that he is referring to Anderson, Hurley, and Hauser, plaintiff only mentions their names in the "parties" section of the complaint in 26 pages of factual allegations. Again, he never attributes *any* action or omission to any of these three individuals. As explained in the previous section, this alone would be grounds for dismissal of the claim against them. *See Ross v. Alabama,* 893 F. Supp. 1545, discussed *supra*; *Roddy v. City of Sheffield, Ala.*, 2012 WL 5427907, \*6, discussed *supra*. This is true even if the claim is one for supervisory liability. *See Franklin v. Curry*, 738 F. 3d 1246, 1249 (11th Cir. 2003)( "to establish supervisory liability under § 1983, a plaintiff must allege that the supervisor personally participated in the alleged unconstitutional conduct or that there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation"). However, the court need not reach that issue, because even had plaintiff specified who the supervisory defendants are *and* attributed specific conduct

---

[37]  Neither the response to the motion to dismiss this complaint nor the sur-reply clarifies who these defendants are. The court has reviewed the motion to dismiss the first amended complaint, which was incorporated by reference into the sur-reply. It likewise did not clarify who these defendants are. While the first amended complaint did set out the constituent members of this group, the court is limited to review of the second amended complaint and cannot consider previous iterations which were mooted by the filing of the instant complaint and have not been incorporated by reference.

to them, absent an underlying constitutional violation, there can be no liability. The claim is due to be dismissed.

## C.   The state law claims

The remaining state law claims are for malicious prosecution, assault and battery/excessive force, trespass, and negligence. Defendants have moved to dismiss each one, asserting discretionary function immunity. *See* doc. 55 at 32-39.

A sister district court recently issued an opinion containing a thorough discussion of the immunity doctrine. In *Spencer v. Fails*, 2018 WL3581673 (S.D. Ala. Jun. 26, 2018), the court explained:

> Alabama law recognizes at least two types of immunity from suit or liability for the individual executive acts of public officers. *Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998). The first is absolute "state-agent" immunity, which is afforded to certain state constitutional officers. *Id.* ("[A]bsolute 'sovereign' immunity ... [is] afforded to certain state constitutional officers, including sheriffs and deputy sheriffs.") (citing *Tinney v. Shores*, 77 F.3d 378 (11th Cir. 1996) and Art. I, Sect. 14 of the Ala. Const. of 1901). The second type of immunity, described as "discretionary function" immunity, is not absolute and applies when a state officer or employee commits a tort while engaged in the exercise of a discretionary function. *Taylor v. Shoemaker*, 605 So.2d 828, 831 (Ala. 1992) (citing *Sellers v. Thompson*, 452 So.2d 460 (Ala. 1984) ).

> The relevant Alabama statute establishing discretionary function immunity is Ala. Code § 6-5-338(a) (1975), which reads:

> > Every peace officer ... who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof ... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

> Under the discretionary function immunity analysis, the court must first determine if Defendants were performing a discretionary function when the alleged wrong occurred. *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003). Discretionary acts are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Id.* at 883; *see also L.S.B. v. Howard*, 659 So.2d 43, 44 (Ala. 1995). If the court finds that Defendants were performing a discretionary function, then the burden shifts to [plaintiff] to demonstrate that the defendants acted in "bad faith, with malice or willfulness." *See Wood*, 323 F.3d at 883; *see also Sheth*, 145 F.3d at 1238-1239. "Acts of such a nature are not considered to be discretionary." *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996).

*Id.* at *14 (S.D. Ala. 2018).

### i.    Malicious prosecution

Defendants move to dismiss the state law malicious prosecution claim against Arias and Partridge on the basis of discretionary function immunity. *See* Ala. Code §6-5-338 (1975). Officers are not entitled to discretionary function immunity if they engage in "acts taken willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken interpretation of the law." *Grider*, 618 F.3d at 1259 (internal citations omitted)(holding that under Alabama state law, state-agent immunity does not shield an officer from liability on a malicious prosecution claim if the facts demonstrate lack of probable cause and malice). "'[M]alice in law, or legal malice,' although a necessary element of a malicious prosecution claim under Alabama law, 'is not sufficient to defeat a state agent's defense of discretionary-function immunity," and a plaintiff must show malice in fact, or actual malice, to overcome the assertion of immunity. *Harris v. Gunter*, 2018 WL 1410838, *4 (M.D. Ala. Mar. 21, 2018). In *Harris*, the court explained:

> Under Alabama law, to overcome a defendant's *prima facie* showing of the applicability of discretionary function or state-agent immunity, a plaintiff must show malicious, bad faith, or willful conduct. *Id.* A plaintiff may satisfy this burden by showing malice in fact, or actual malice, *i.e.*, by demonstrating that the defendant's conduct was "'so egregious as to amount to willful or malicious conduct engaged in in bad faith,' " such as by showing that the defendant bore "'personal ill will against the [plaintiff] and that he maliciously or in bad faith arrested him solely for purposes of harassment.'" *Id.* (quoting *Couch v. City of Sheffield*, 708 So. 2d 144, 153–54 (Ala. 1998), *abrogated on other grounds by Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)).

*Id.* at *4 (footnote omitted).

The court has already addressed the sufficiency of plaintiff's allegations with regard to the common law elements of malicious prosecution. It also finds that plaintiff has alleged facts from which it reasonably can be inferred that defendants instigated the prosecution knowing that plaintiff was innocent. Viewed in the light most favorable to plaintiff, these allegations are sufficient to support a reasonable inference that the officers put into motion the prosecution that resulted in his being arrested willfully, in bad faith, and for the purpose of harassment. Therefore, the officers are not entitled to discretionary function immunity on the state law malicious prosecution claim at this stage of the proceedings. *See Williams*, 2013 WL 1117297, *8 (denying a motion to dismiss Section 1983 and state law malicious prosecution claim on the same basis – because facts were sufficient to infer malice and to show that probable cause was lacking); *Harris*, 2018 WL 1410838 (denying motion to dismiss state law malicious prosecution claim).

ii.      **Assault and battery/excessive force**

This claim is asserted against Arias and Partridge.[38] The plaintiff in an action alleging assault and battery must prove (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Harper v. Winston County*, 892 So.2d 346, 353 (Ala. 2004). Plaintiff alleges that Arias and Partridge "caused [his] assault and battery …" by "caus[ing] his life to be placed in danger and … sho[oting] him] twice in the back." In so doing, plaintiff alleges, the officers violated "the United States Constitution, Alabama law and state statutes, and the [City's] mandatory regulations and policies." *See* doc. 51 at 36. Plaintiff does not allege that the officers acted willfully, maliciously, fraudulently, or in bad faith in shooting him; rather, he contends they acted "beyond their authority and/or under a mistaken interpretation of the law" and with neglect, carelessness and unskillfulness when they "assault[ed] [him] and caus[ed] [him] to be harmed by gunshots." *Id.*

In their motion to dismiss, defendants argue that Arias and Partridge were acting within their discretionary authority when they responded to the 911 call. *See* doc. 55 at 33-34. Plaintiff offers no dispute. *See* doc. 51 at 36, 37 (alleging that Arias and Partridge acted in the line and scope of their authority with the City …" when they assaulted him). "The

---

[38]   Plaintiff explicitly states that "this count is asserted against the [d]efendants Arias and Partridge." *See* doc. 51 at 36. While he later alleges that "[t]he city is liable for the negligent, careless and unskillful acts by its agents, the [i]ndividual defendants Arias and Partridge," *see id.* at 37, given plaintiff's clear and absolute statement that the claim is only asserted against these two defendants, the court will not analyze it as having been asserted against the City, as well.

question then becomes whether … plaintiff has alleged facts from which it can be plausibly inferred that [Arias and Partridge] acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority[,]" or under a mistaken interpretation of law. *See Anderson v. City of Homewood*, 2016 WL 7438895, *11 (N. D. Ala. Dec. 27, 2016)

Plaintiff has failed to meet this burden. The operative response is plaintiff's response to the motion to dismiss the first amended complaint, which plaintiff has incorporated by reference. In this response, plaintiff argues that he has sufficiently alleged that the officers acted maliciously and in bad faith because he has alleged that they used force without probable cause to do so. However, that argument is non-responsive to the instant motion to dismiss because in this complaint, unlike the first amended complaint, plaintiff never alleges that the officers acted maliciously or in bad faith. Moreover, the court has already determined that the force applied was reasonable under the circumstances.

In this complaint, plaintiff only alleges that the officers acted "beyond their authority and/or under a mistaken interpretation of the law" when they assaulted him. The incorporated response does not explain how the officers acted beyond their authority or how they were mistaken about the governing law, and the complaint does not allege facts from which it plausibly can be inferred that they did. The court will not manufacture the arguments for plaintiff. *See, e.g., Resolution Trust Corp.,* 43 F.3d at 599 (11th Cir. 1995)("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"); *Ploof*, 2016 WL 393583, at *1, n.1 (where plaintiff incorporated previous argument by reference, stating that "[i]t is plaintiff's obligation to oppose defendants' arguments, not the court's obligation to attempt to

ascertain what arguments from other motions Plaintiffs may be trying to make."); *Bowden*, 124 F. Supp.2d at 1236 (M.D. Ala. 2000)("[i]t is not for the court to manufacture arguments on plaintiff's behalf"). Absent some developed argument explaining how, based on the allegations of *this* complaint, the complaint contains sufficient allegations to conclude the officers acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law" and are not entitled to discretionary function immunity, the motion to dismiss as to this claim is due to be granted.[39]

Alternatively, the officers are entitled to discretionary function immunity from the state law assault and battery/excessive force claim for the same reasons they are entitled to qualified immunity from the Section 1983 excessive force claim. *See Brown v. City of Huntsville*, 608 F.3d 724, 742 (granting summary judgment as to defendant's "assault and battery/excessive force" claim because that defendant's use of force did "not constitute a constitutional violation," and "neither [did] it show the required willfulness, maliciousness, fraud, or bad faith necessary to deny [the officer] state agent and statutory, discretionary-function immunity."); *Childress v. City of Huntsville*, 2013 WL 12147715 (N.D. Ala. May 10, 2013)("For the same reasons that [the officers] are not entitled to qualified immunity on plaintiff's Fourth Amendment clai[m] for … excessive force, they also are not entitled to state-agent immunity for plaintiff's state law clai[m] for … assault and battery/excessive force.); *Walker v. City of Huntsville*, 62 So.3d 474, *494 (Ala. 2010)(because federal court

---

[39] To the extent plaintiff contends in his brief that his allegation that the officers violated the Fourth Amendment is sufficient to overcome the officers' assertion of discretionary function immunity, this argument is unpersuasive. The court has already determined that plaintiff has failed to allege a Fourth Amendment violation as to the facts that give rise to the assault and battery claim.

had already entered a judgment on a §1983 claim for excessive force, and the state law assault and battery claim was based on the same actions, plaintiff was collaterally estopped from asserting it).[40]

### iii.    Trespass

This count is asserted against Arias, Partridge, and the City. *See* doc. 51 at 37. Under Alabama law, trespass is defined as "[a]ny entry on the land of another without express or implied authority." *Guettler v. City of Montgomery*, 2012 WL 1987188, *9 (M.D. Ala. Jun. 4, 2012)(quoting *Central Parking Sys. of Ala., Inc. v. Steen*, 707 So.2d 226, 228 (Ala. 1997).

Plaintiff states that the trespass was "committed in violation of the United States Constitution, Alabama law and state statutes, and Enterprise's mandatory regulations and policies," and alleges as follows: "The [officers] acted beyond their authority and/or under a mistaken interpretation of the law in their neglect, carelessness and unskillfulness by trespassing onto [p]laintiff's property and causing [p]laintiff to be harmed by gunshots." *See* doc. 51 at 37-38. Plaintiff further alleges that the officers "wrongfully intruded upon

---

[40]  Additionally, to the extent plaintiff contends the officers acted with neglect, carelessness and unskillfulness, he has failed to overcome the assertion of immunity. The discretionary function immunity shield is not pierced by allegations that the officers acted negligently. *See Anderson*, 2016 WL 7438895, *13 ("To the extent plaintiff alleges a claim for gross negligence against [individual officers] due to his arrest, discretionary function immunity … bars the claim. [T]he plaintiff must plead facts from which it can be inferred that [the officers] acted 'willfully, maliciously, in bad faith, or beyond [their] authority.' Mere negligence, even gross negligence, is not enough to overcome the immunity. This claim is due to be dismissed."). *See also Wright v. City of Ozark*, 2014 WL 1765925, *9-10 (M.D. Ala. May 2, 2014)(explaining that there is no tort for "neglectfulness, unskillfulness, or carelessness" against individual officers, but that a municipality can be held liable for the neglect, unskillfulness, or carelessness of an officer or employee pursuant to Ala. Code § 11-47-190" and that any allegations that the officers acted in such a manner were relevant to the city's liability for a claim against it).

the curtilage of his home without a warrant and with guns drawn" – "without announcing themselves as police" – "which resulted in the trespass of [his] home and caused him to be injured."

Defendants argue that discretionary function immunity bars the claims. Thus, the "question [is] whether … plaintiff has alleged facts from which it can be plausibly inferred that [Arias and Partridge] acted "willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority" or under a mistaken interpretation of law when they entered his home. *Anderson*, 2016 WL 7438895 at *11. Because plaintiff does not allege that the officers acted willfully, maliciously, fraudulently, or in bad faith, the question is whether he has alleged sufficient facts to plausibly establish that the officers acted "beyond their authority" or "under a mistaken interpretation of law." Plaintiff has not met this burden.

While he alleges in a conclusory fashion in the second amended complaint that the officers acted "beyond their authority" and "under a mistaken interpretation of law," he does not provide factual allegations which, if proved, would show that the officers acted beyond their authority or that they were mistaken about a law. In fact, plaintiff never identifies the "authority" the officers are alleged to have exceeded or the "law" about which they are alleged to have been mistaken. While he states that the trespass was "committed in violation of the United States Constitution, Alabama law and state statutes, and Enterprise's mandatory regulations and policies," he does not specify in the second amended complaint or the brief *which* constitutional rights, laws, statutes, regulations, or policies the officers violated in entering his home or *how* they did so. While plaintiff argues in his brief that the court should consider plaintiff's allegations that the officers violated

the Fourth and Second Amendments in determining whether or not his allegations are sufficient to withstand an assertion of discretionary function immunity, this argument is unavailing. Although plaintiff alleges in his second amended complaint that the officers violated (1) the Fourth Amendment when they pointed their guns at him, (2) the Second and Fourth Amendments when they shot him, and (3) the Fourth Amendment when they maliciously prosecuted him, he does not allege that the officers violated either amendment when they entered his home. Therefore, even if an allegation that the officers violated those amendments when they entered his home was sufficient to rebut the officers' assertion of discretionary function immunity, plaintiff has made no such allegation. As the complaint stands, plaintiff has pointed to no specific constitutional rights that the officers violated in entering his home. A mere reference to the "the United States Constitution" is insufficient.[41]

The Eleventh Circuit addressed a similar issue in *Fowler v. Meeks*, 569 F. App'x 705 (11th Cir. 2014). In that case, the district court denied a motion to dismiss which asserted discretionary function immunity because it found that plaintiff had sufficiently alleged that the officers failed to follow detailed rules or regulations when he stated as follows: "The Defendants ... knowingly failed to enforce Alabama laws and regulations of

---

[41]  Moreover, the court has already determined that plaintiff has failed to allege a Fourth or Second Amendment violation relating to the gun-pointing or shooting; therefore, a reference to those claims is futile. While the court has found that plaintiff has stated a Fourth Amendment malicious prosecution claim, the facts that form the basis of that constitutional violation occurred after the officers entered his home and thus, do not impact this analysis.

the Covington County Sheriff's Department pertaining to investigation, in the use of force

and possible deadly force by Defendant Covington County deputies." *Id*. at 707.

> The Eleventh Circuit reversed, stating:

> We disagree. Reviewing the complaint in this case, we cannot conclude that Fowler sufficiently alleged the failure to follow any such detailed rules or regulations to overcome immunity. First, in a single paragraph in the facts section of his complaint, Fowler alleged that "the Defendants ... knowingly failed to enforce Alabama laws and regulations of the Covington County Sheriff's Department pertaining to investigation, in the use of force and possible deadly force by Defendant Covington County deputies." But Fowler did not identify how *the City* failed to follow any rules, or even what specific rules and regulations the City and its agents failed to follow. Rather, this allegation specifically states that the rules applied to Covington County deputies and it was the Covington County deputies who failed to adhere to them. In the absence of a specific rule, regulation, or guideline set out to limit the City and the individual officers' broad discretion in exercising his or her judgment, we cannot conclude that allegations fall within the exception to immunity under § 6–5–338. *See, e.g. Giambrone v. Douglas,* 874 So.2d 1046, 1054 (Ala.2003) (discussing the various regulations that limited the employee's discretion in the exercise of his duties). Thus, even if we accept everything in the complaint as true, Fowler's single reference to rules and regulations is insufficient to defeat the City's immunity claim under § 6–5–338.

*Fowler v. Meeks*, 569 F. App'x. 705, 709 (11th Cir. 2014). Likewise, in this case, plaintiff

has pointed to no specific constitutional amendment that he contends the officers violated

when they entered his home and has not identified "the authority" they exceeded or the

"law" which they misunderstood. Because "the facts that [plaintiff] alleges do not support

the conclusory labels that he uses to describe [the officer's conduct]," *Kelley v. City of*

*Fairfield, Ala.*, 2015 WL 4229872, *6 (N.D. Ala. Jul. 13, 2015), plaintiff has failed to

overcome the officers' defense of discretionary function immunity. *See id.* (dismissing

state law trespass claim that was based only on conclusory allegations). Therefore, this claim is due to be dismissed.[42]

Finally, to the extent the trespass claim is asserted against the City, the City has moved to dismiss the claim on the basis that it is also entitled to state-agent immunity. *See* doc. 55 at 38; doc. 73 at 48-49. Plaintiff failed to respond to this argument, which is well-taken. *See Howard v. City of Atmore*, 887 So.2d 201, 211 (Ala. 2003)("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then … the city by which he is employed is also immune."). *See also Wright*, 2014 WL 1765925 at *9-10 (explaining that while a city can be liable under Ala. Code § 11-47-190 for the "neglect, carelessness or unskillfulness" of its agents, the inquiry does not end there, as the City is still entitled to immunity if the defendant officers are). The claim against the City is due to be dismissed.

### iv. Negligence

This claim is alleged against Arias, Partridge, and the City. However, plaintiff has abandoned the claim by failing to defend it in his response or in his sur-reply. While plaintiff's sur-reply incorporates his response to the motion to dismiss the first amended complaint, plaintiff does not defend the negligence claim in that response. *See* doc. 30 at 4 (stating "Plaintiff concedes three of his state law claims against the [d]efendants, to-wit,

---

[42]   Additionally, to the extent plaintiff contends the officers acted with neglect, carelessness and unskillfulness, the claim is due to be dismissed. Again, the discretionary function immunity shield is not pierced by allegations that the officers acted negligently. *See Anderson*, 2016 WL 7438895 at *13. *See also Wright*, 2014 WL 1765925  at *9-10 (discussing that these allegations are relevant to a claim against a city, not individual officers who were acting in their discretionary authority).

his clai[m] for negligence."). Absent any argument whatsoever to support this claim, the court deems it abandoned and waived, and is due to be dismissed as to both Arias and Partridge and the City. *See, e.g., Black,* 461 F.3d at 588 n.1(finding that plaintiff abandoned claim by failing to defend it in response to a motion to dismiss); *Coalition for the Abolition of Marijuana Prohibition,* 219 F.3d at 1326 (11th Cir. 2000)(finding that party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned); *Kirkland*, 2009 WL 596538, *2 (M.D. Ala. Mar. 6., 2009) (collecting cases and granting motion to dismiss where plaintiff had not filed a brief in opposition).

## D.   Additional matters

Defendants move to dismiss all punitive damages claims against the City and all claims against three unnamed defendants – Braun, Spence, and Darby. *See* doc. 55 at 39. Plaintiff states in his response to the instant motion to dismiss that he asserts no such claims; therefore, they "cannot be 'dismissed.'" *See* doc. 59 at 14. Plaintiff's point is valid. To the extent defendants seek dismissal of these supposed claims, the motion is moot.

## VI.   Conclusion

For the above reasons, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion to Dismiss (doc. 55) be **GRANTED in part and DENIED in part** as follows:

(1) The motion to dismiss the Fourth Amendment illegal seizure claim against defendants Arias and Partridge be GRANTED.

(2) The motion to dismiss the Fourth Amendment excessive force claim against defendants Arias and Partridge be GRANTED.

(3) The motion to dismiss the Second Amendment claim against defendants Arias and Partridge be GRANTED.

(4) The motion to dismiss the Fourth Amendment malicious prosecution claim against Arias and Partridge be DENIED.

(5) The motion to dismiss the *Monell* claim against the City, Chief Jones, and the "supervisory defendants" be GRANTED.

(6) The motion to dismiss the state law malicious prosecution claim against defendants Arias and Partridge be DENIED.

(7) The motion to dismiss the state law assault and battery/excessive force claim against defendants Arias and Partridge be GRANTED.

(8) The motion to dismiss the state law trespass claim against defendants Arias, Partridge, and the City be GRANTED.

(9) The motion to dismiss the state law negligence claim against defendants Arias, Partridge, and the City be GRANTED.

It is further

ORDERED that the Plaintiff may file any objections to this Recommendation on or before **October 1, 2018.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done, on this the 17th day of September, 2018.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge